702 A.2d 1027

COMMONWEALTH of Pennsylvania, Petitioner,

v.

Milton MULHOLLAND, Respondent.

COMMONWEALTH of Pennsylvania, Petitioner,

v.

Michael ALBERT, Respondent.

Supreme Court of Pennsylvania.

Argued Sept. 16, 1997.

Decided Oct. 10, 1997.

636

638

Claire C. Capristo, Michael J. Streily, Scott A. Bradley, Pittsburgh, for Com.

Charles R. LoPresti, Pittsburgh, Patrick J. Thomassey, Monroeville, for Mulholland.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION OF THE COURT

FLAHERTY, Chief Justice.

We allowed this appeal under our extraordinary jurisdiction within our king's bench powers following a mistrial in a criminal case. The issues are whether the defendants may be prosecuted again, and, if reprosecution is allowed, whether venue or venire may be changed and whether the trial court erred in removing the local district attorney in favor of prosecution by the state attorney general.

The following background underlies the issues raised in the appeal. Shortly after midnight, in the early hours of October 12, 1995, Jon E. Gammage was driving his cousin's Jaguar northbound on Route 51 in the South Hills section of Allegheny County. Lieutenant Milton Mulholland, a twenty-four year veteran of the Brentwood Police Department, was on patrol when, as he states, erratic driving drew his attention to the Gammage vehicle. He radioed first that he was following the car, then that he was stopping the car to check the condition of the driver and requesting backup. After the stop, four more officers arrived in response to the radio calls: first, Sergeant Keith Henderson of the Whitehall Police, then John Vojtas, another Brentwood policeman, Michael Albert, of Baldwin Township, and Shawn Patterson, another Whitehall officer.

From the record it appears that before Albert and Patterson arrived, Mulholland was checking Gammage's license and registration, and, when he learned that the car was registered to someone else and the registration was expired,[1] Vojtas, positioned at the driver's door, ordered Gammage out of the car. Gammage exited the car with a cellular phone. Vojtas, who later explained that he thought the phone was a weapon, knocked it out of Gammage's hand with a flashlight. Gammage lunged at Vojtas, who was assisted by Mulholland and

1. Although Gammage was not the registered owner of the car, he was driving it with the permission of the owner, his cousin Ray Seals, then a player on the locally popular professional football team, the Steelers. Gammage's death received intense publicity through the electronic and print media.

Henderson, whereupon the four struggling men slid down the driver's side of Gammage's vehicle to the ground. During the initial scuffle, Henderson retrieved Vojtas's flashlight and struck Gammage in the legs. While they were all struggling on the ground, Vojtas attempted to handcuff Gammage. Gammage bit down on Vojtas's thumb, and Vojtas punched Gammage in the face several times in an effort to free his thumb. Vojtas then left the fray to await the paramedics who were summoned to treat him.

The struggle continued as Mulholland and Henderson attempted to handcuff Gammage. Albert, then Patterson, arrived. Albert used a collapsible baton on Gammage's chest in an effort to lift him in order to enable the officers to cuff Gammage's hands behind his back. Finally, the officers decided to cuff Gammage's hands in front, but Gammage continued to struggle to such an extent that the officers requested the paramedics to restrain his legs with stretcher restraints. Suddenly, Mulholland noticed that Gammage was no longer breathing and notified a paramedic; the restraints were removed and the paramedics initiated CPR. CPR was performed continuously for forty-eight minutes until Gammage was pronounced dead at a hospital emergency room.

A pathologist in the coroner's office of Allegheny County performed an autopsy. He concluded that Gammage's death was caused by compression asphyxia and was a homicide. The internal examination revealed evidence of trauma about the upper chest, upper back, and neck, as well as petechial hemorrhaging of the eyes. These pinpoint hemorrhages of the eyes indicated an obstruction of Gammage's blood and oxygen supplies. All of these findings supported the conclusion that the cause of death was compression asphyxia. The district attorney's office filed no criminal charges based on the autopsy.

An open inquest was held and a coroner's jury was empaneled to hear testimony into Gammage's death. Christopher Conrad, Esq., head of the homicide division of the Allegheny County district attorney's office, conducted the inquest. Following three days of testimony, the jury recommended that all

five police officers involved in Gammage's death be charged with criminal homicide. That recommendation was advisory in nature. Robert E. Colville, Esq., the District Attorney of Allegheny County, together with a team of assistant district attorneys, decided to charge Mulholland and Vojtas with third degree murder and official oppression, and to charge Albert with involuntary manslaughter. No charges were filed against Henderson, Patterson, or any of the paramedics on the scene when Gammage died.

At the officers' preliminary hearing, the court dismissed the charges of official oppression and third degree murder against Mulholland and Vojtas, but held all three officers on the charge of involuntary manslaughter. Pretrial motions were filed and argued, resulting in a "gag order" prohibiting the parties, their witnesses, and their counsel from making extrajudicial statements about the cases; severance of Vojtas's trial from that of Mulholland and Albert due to antagonistic defenses; and an order granting a change of venire due to an overwhelming amount of inflammatory pretrial publicity. Pursuant to 42 Pa.C.S. § 8702 and Pa.R.Crim.P. 312(b), this court designated Chester County for summoning, selecting, and impanelling a jury to try Mulholland and Albert.

A jury was selected in Chester County and transported to Allegheny County, where trial began promptly in October 1996. Officer Henderson and all the paramedics at the scene of death were called as Commonwealth witnesses. In addition, the Commonwealth called a tow truck driver who came forward after the inquest and made a series of inconsistent statements to the Commonwealth, one of which was not disclosed to the defense prior to trial. The Commonwealth also called Cyril H. Wecht, M.D., J.D. Prior to being designated as a Commonwealth witness, Dr. Wecht had been retained privately by the Gammage family as an expert witness in a civil lawsuit seeking damages for Gammage's untimely death. Dr. Wecht had formerly been county coroner for more than a decade and was coroner at the time of trial though he had not been coroner at the time Gammage died. Dr. Wecht conducted a second autopsy on Gammage's body on behalf of Gam-

mage's survivors. In addition, Dr. Wecht is also a lawyer and maintains a private law practice.

During the trial, Dr. Wecht testified that he agreed with the coroner's opinion that Gammage died of compression asphyxia, and stated that death resulted from the combined force exerted by all five of the officers during the struggle with Gammage. On recross-examination, defense counsel asked: "You tell me what my client did. Tell me what my client did from A to Z." Wecht answered, "No. It's not for me to tell you what your client did. It's for the client to tell me, the ladies and gentlemen of the jury, what he did, what he was doing there and why he was participating in this. It's not for me to cleave out." This response, which was construed as a comment on Mulholland's fifth amendment privilege, resulted in declaration of a mistrial.

In contemplation of the retrial of Mulholland and Albert, pretrial motions were filed on their behalf and heard by the trial court. The trial judge's order disposing of these post-mistrial, pretrial motions is the subject matter of this appeal. The court ordered, inter alia, that alleged prosecutorial misconduct was not so egregious as to prohibit retrial on grounds of double jeopardy, but the prosecutor engaged in selective prosecution which had the effect of barring reprosecution of Mulholland and Albert; if the officers were retried, however, the Supreme Court's designation of Chester County as the county of venire was still in effect and could not be relitigated, and the District Attorney of Allegheny County was removed from the prosecution and the Attorney General of Pennsylvania was substituted as the prosecutor.

The Commonwealth appealed this order to the Superior Court of Pennsylvania; it also petitioned this court to exercise plenary jurisdiction over the cases under our extraordinary jurisdiction within the king's bench powers of this court. We granted the petition to review the common pleas order in our extraordinary jurisdiction, and the appeals pending in the Superior Court, involving identical issues, were transferred to this court.

Of the four issues, only the first has been raised by Mulholland and Albert, who seek reversal of the determination that double jeopardy does not prohibit their retrial. The trial court granted a mistrial due to the statement of a Commonwealth witness, Dr. Wecht, that Mulholland had an obligation to explain his actions to the jury, which was a clear violation of Mulholland's fifth amendment rights. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). The argument of Mulholland and Albert that prosecutorial misconduct bars retrial, however, is not based on that episode alone. They argue that a pattern of misconduct pervaded the trial, and that numerous examples of misconduct imply intentional behavior by the prosecutor which warrants the sanction of a double jeopardy bar to reprosecution. They allege that misrepresentations were made to a potential expert witness for the Commonwealth, Kevin Dworek; that the Commonwealth violated the "gag order" prohibiting extrajudicial statements about the trial; that the prosecution violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding exculpatory evidence from the defense; that their due process rights were violated when a private attorney, who was conducting related civil litigation on behalf of Gammage's survivors, was permitted to control or strongly influence the course of the criminal prosecution, which amounted to an abdication of the prosecutorial function of the assistant district attorney; and that their due process rights were violated when Mr. Conrad, a deputy district attorney, misled them into waiving their fifth amendment right not to testify at the coroner's inquest by virtually assuring them that no criminal proceedings would be brought against them. They argue that this misconduct constitutes a pattern so pervasive and improper that it demonstrates a Commonwealth intent to prejudice them to the point of denying them a fair trial. If that is so, the prosecutorial misconduct violates *Commonwealth v. Smith,* 532 Pa. 177, 615 A.2d 321 (1992), and Mulholland and Albert cannot be retried on grounds of double jeopardy. *Smith* held that retrial is barred by double jeopardy "not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the

conduct of the prosecutor is intentionally undertaken to preju-
dice the defendant to the point of the denial of a fair trial."
*Id.* 615 A.2d at 325.

■ The first specification of misconduct is the claim that
the Commonwealth, believing it could not prove the elements
of malice against the officers, deliberately misled Dworek as to
the facts it would be required to prove, thereby allowing him
to answer a hypothetical question based upon assumed but
erroneous facts. The record does not support this contention.
Dworek attended the preliminary hearing, and when he heard
the testimony of other witnesses, concluded that he had not
been given all the facts. He then testified for the defense
rather than for the Commonwealth and was instrumental in
having the charges of third degree murder dismissed. His
subsequent pretrial testimony on the claim of prosecutorial
misconduct was ambiguous: he was unclear whether facts
were withheld or what prosecutorial statements were mislead-
ing. This claim, then, does not warrant relief.

■ Next, Mulholland and Albert give specific examples of
statements to the media which they say violated the court's
prohibition against such communications. These included
statements by David B. White, Esq., counsel for the Gammage
family, regarding the composition of the jury, and statements
by Dr. Wecht, the medical expert hired by the Gammage
family, that the absence of black jurors "was not right."
These statements occurred during jury selection, prior to the
beginning of the trial. Both Dr. Wecht and Attorney White
made additional statements, along similar lines, to the media
during the trial. Two other witnesses, listed by both the
Commonwealth and the police officers as witnesses, also ap-
peared on television and made public statements about the
trial. At the time of the television appearances, they had
already appeared as Commonwealth witnesses and been re-
leased by the Commonwealth, yet they remained as defense
witnesses. Neither the defense nor the prosecution informed
them of the "gag order." The statements of Mr. White, Dr.
Wecht, and the other two witnesses Mulholland and Albert

ascribe to the prosecutor, as he had never informed them of the "gag order."

This argument fails for two reasons. First, in order for the extrajudicial statements to constitute prosecutorial misconduct, the prosecutor must be clearly responsible for the misconduct.[2] Here, the objectionable statements were not made by the prosecutor's office, but by others. The statements of White, a private attorney, are attributed to the prosecutor because he allegedly "coordinated" Commonwealth witnesses. The other three witnesses who made extrajudicial statements were listed as witnesses by both the prosecution and the defense, and, accordingly, any error must be shared by both sides. Second, if such misconduct occurred, a mistrial was not required; the court could impose contempt sanctions or bar the testimony of any witness who violated the "gag order."

The alleged *Brady* violation was the prosecutor's failure to disclose information with respect to Commonwealth witness Frank Belajac, a tow truck driver who witnessed part of Gammage's struggle with the police officers. Belajac had not come forward immediately as an eyewitness and had not testified at the preliminary hearing. He testified before the grand jury, but changed his testimony at trial, implicating the police officers more seriously than he had done in his grand jury testimony. The officers allege that the Commonwealth

2. A prosecutor may be responsible for statements made by a prosecution witness. *See Commonwealth v. Pierce*, 537 Pa. 514, 645 A.2d 189 (1994). In *Pierce*, we held that a prosecutor was guilty of misconduct for permitting a prosecution witness to remain in the courtroom in violation of a sequestration order even if the prosecutor was actually unaware of the identity of the witness; we stated that "the prosecution is obliged to ensure that all of the witnesses [it] intends to call comply with the orders of the trial court." *Id.* 645 A.2d at 197. We further held that the prosecutorial misconduct in *Pierce* was not of such a nature as to require a new trial, for it was not a deliberate attempt to prejudice or mislead the jury. *Id.*

In this case, the prosecutor's failure to "ensure that all of the witnesses [it] intends to call comply with the orders of the trial court," even if inadvertent, may constitute misconduct. Such misconduct, however, does not necessitate a new trial, and falls far short of the type of misconduct condemned in *Commonwealth v. Smith, supra*, which raises a double jeopardy bar to retrial.

not only withheld knowledge of the changed testimony, but withheld a report generated prior to trial which was a document critical to the defense for impeachment purposes. This omission allegedly violated *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 108 (1972), where the Court extended its *Brady* holding, stating: "When the 'reliability' of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." Further, it is alleged that Belajac lied under oath when he testified that he had not met with the prosecutors prior to testifying at trial.

■ The allegation that the Commonwealth failed to disclose a material statement of witness Belajac, to the extent it is supported by the record, does not establish a violation under *Brady* or *Giglio, supra.* A violation of *Brady* or *Giglio* requires that the prosecution intentionally withhold exculpatory evidence which was material to the issues to be tried or evidence which materially undermines the credibility of a key prosecution witness. Allegedly, one Belajac statement was not disclosed by the Commonwealth in a timely fashion, but trial was recessed while the statement was provided to and reviewed by the defense. The statement in question was duplicative of other evidence in the possession of the defense in that it was one of several in a series which disclosed inconsistencies in the various statements Belajac had made. It was, therefore, cumulative and was not inherently exculpatory. Indeed, Mulholland and Albert acknowledge that this alleged *Brady* violation was "in and of itself insufficient to invoke the bar of double jeopardy." [3]

■ Moreover, Belajac's alleged false testimony denying a meeting with prosecutors prior to trial was, arguably, not a falsehood, and, in any event, cannot be attributed to the

3. *Compare Commonwealth v. Moose,* 424 Pa.Super. 579, 623 A.2d 831, 837 (1993) and *Commonwealth v. Santiago,* 439 Pa.Super. 447, 654 A.2d 1062, 1085 (1994), holding that even intentional prosecutorial misconduct, unless undertaken with the specific intention of depriving the defendant of a fair trial, does not implicate the double jeopardy clause under *Commonwealth v. Smith, supra.*

prosecution. Belajac, asked if he met with the prosecutor prior to trial to go over his testimony, denied such a meeting. There was, however, a meeting of himself, his attorney, and an assistant district attorney, (not the trial prosecutor), at which Belajac reviewed his prior written statements in order to refresh his memory and the district attorney asked no questions of Belajac. Thus we agree with the trial court that Mulholland and Albert have failed to establish a violation under *Brady* or *Giglio*.

The officers' claim that the district attorney abdicated his prosecutorial function to a private attorney, allowing that attorney to control the course of the litigation, in violation of the officers' due process rights,[4] fails due to lack of support in the record. Mulholland and Albert rely on isolated testimony by private attorney White that he told his expert witness, Dr. Wecht, not to prepare a written report of his findings. To attribute this instruction to the prosecutor, Mulholland and Albert allege that the prosecutor admitted that he talked with attorney White "from time to time about matters procedural and substantively" and that White was the "coordinator" of his people. Mulholland and Albert do not cite where such admissions appear in the record, or they cite pages which do not support the allegations.[5]

A final allegation of prosecutorial misconduct is that Mr. Conrad, a deputy district attorney, misled them into waiving their fifth amendment right not to testify at the coroner's inquest by "virtually" assuring them "to the effect" that no criminal charges would be filed against them. This

4. "Although there is no impediment to a district attorney's consulting with other attorneys regarding particular cases or his duties in general, the General Assembly by law has limited the situations in which other attorneys may be employed to actually perform those duties. *Cf. Commonwealth ex rel. Shumaker v. New York & Pennsylvania Co.*, 378 Pa. 359, 106 A.2d 239 (1954)." *Commonwealth v. Lawson*, 548 Pa. 588, ——, 699 A.2d 1246 (1997).

5. In a record containing thousands of pages, this court will not search every page to substantiate a party's incomplete argument. *See* Pa. R.A.P. 2119(c) (If reference is made to the evidence in the record, "the argument must set forth ... a reference to the place in the record where the matter referred to appears....").

allegation does not constitute prosecutorial misconduct, much less the sort of misconduct condemned in *Commonwealth v. Smith, supra,* as the record fails to establish any misleading by the prosecutor. Even Mulholland and Albert do not claim that Mr. Conrad assured them they would not be charged— merely that Mr. Conrad "virtually" assured them, and that Mr. Conrad "implied" that they would not be charged. It is apparent from the record that Mr. Conrad did not mislead the police officers, but rather that the officers assumed they would not be charged. These allegations are insufficient to establish a constitutional violation by the prosecutor.

None of the examples of prosecutorial misconduct, individually or in combination, suffices to establish a prosecutorial intent to deprive Mulholland and Albert of a fair trial to the extent which would bar retrial under the double jeopardy clause. We therefore affirm the trial court's order denying the motion to bar reprosecution on the basis of double jeopardy.

■ The next issue is whether the trial court erred in granting the motion to bar reprosecution on the basis of selective prosecution. The claim is based on the fact that only three of five officers involved in the arrest and death of Gammage were prosecuted, though the coroner's jury recommended that all five should face criminal charges.

The trial court correctly set forth the legal standard for establishing selective prosecution: first, others similarly situated were not prosecuted for similar conduct, and, second, the Commonwealth's discriminatory selection of them for prosecution was based on impermissible grounds such as race, religion, the exercise of some constitutional right, or any other such arbitrary classification. *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). The trial court, however, failed to identify how the Commonwealth violated the second prong of the test.

Assuming that the first prong has been established, though the prosecution disputes this, there is no evidence of record that there was any impermissible reason for the Common-

wealth's selection of Mulholland, Albert, and Vojtas for prosecution and the omission of Henderson and Patterson. Rather, the record contains sound reasons why the latter two were not charged with criminal behavior. Thus, the trial court's application of the *Wayte* test was erroneous.

Although the trial court's opinion includes a long passage justifying its determination that Mulholland, Albert, and Vojtas were selectively prosecuted for impermissible reasons, there is no identification of any specific improper reason. Instead, the trial court erroneously shifted the burden from the defense to the prosecution to establish or refute the claim.

■■■ The trial court was troubled by the defense claim that public pressure played a role in the decision to prosecute, but public pressure is not an impermissible consideration in the prosecutorial function. The public perception of the criminal justice system is one of a broad spectrum of factors a prosecutor may properly consider in the exercise of his discretion, and this has been true from time immemorial. *Commonwealth v. Slick*, 432 Pa.Super. 563, 639 A.2d 482, 486, *alloc. denied* 538 Pa. 669, 649 A.2d 671 (1994) (citing *Wayte v. United States, supra* ).

Finally, the trial court failed to justify its refusal to accept the Commonwealth's explanation for charging some officers and declining to charge others. The Commonwealth reasonably believed that the testimony of one officer was necessary to establish the corpus delicti of the crime, and Henderson was chosen because he was involved from the beginning to the end of the incident. With respect to Patterson, the Commonwealth deemed his late arrival and his minimal physical participation in the struggle to be sufficient to justify different treatment from the other officers.

■■■ The trial court goes to great lengths to explain its rejection of these explanations, but its rejection is unconvincing and is based on unacceptable inferences from the record. Essentially, the court reasoned that the Commonwealth's legal theory conflicted with its medical theory. Its medical theory was that the combined actions of all five officers caused

Gammage's death. The court inferred that the Commonwealth's only reason for declining to charge Henderson was its belief that he did nothing wrong, and stated that if his testimony was to be used to establish the corpus delicti, he should have been given immunity. There was no reason, however, to offer immunity when the witness testified voluntarily without immunity—indeed, there was no authority to offer immunity under these circumstances. "Use immunity is the prohibition against the use in any criminal proceeding of 'testimony or other information *compelled under . . . order* (or any information directly or indirectly derived from such testimony or other information).' *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)." *Commonwealth v. Johnson,* 507 Pa. 27, 487 A.2d 1320, 1321–22 (1985)(footnote omitted, emphasis added). Under the statute governing immunity, 42 Pa.C.S. § 5947, the requisites are:

> **(b) Request and issuance.**—The Attorney General or a district attorney may request an immunity order from any judge of a designated court, and that judge shall issue such an order, when in the judgment of the Attorney General or district attorney:
>
> > (1) the testimony or other information from a witness may be necessary to the public interest; and
> >
> > (2) *a witness has refused or is likely to refuse to testify* or provide other information on the basis of his privilege against self-incrimination.

42 Pa.C.S. § 5947(b)(emphasis added). We have held that "the decision to seek a grant of immunity in any individual case rests within the judgment of the prosecutor. It is up to the *executive* branch of government to decide when and to whom immunity will be granted." Furthermore, a decision "as to whether immunity should or should not be granted [rests] *entirely* within the judgment of the Attorney General or District Attorney." *Johnson,* 487 A.2d at 1322 (emphasis added). The trial court's view of the Commonwealth's motives is therefore not supported by the record or the law.

With respect to Patterson, likewise, the trial court relied on its conclusion that the Commonwealth's legal theory was in

conflict with its medical theory. Again, since the medical theory was that Gammage's death was caused by the cumulative effect of the five officers acting in concert, the court concluded that it was unconstitutionally discriminatory and vindictive not to charge Patterson. Without any authority, the court assumed that the prosecutor's cumulative theory of causation required him to treat all actors identically. *Cumulative* causation does not mean or imply *equal* causation. Patterson's comparatively minor participation in the affray clearly justified the Commonwealth's decision to treat him differently when making decisions as to the criminal charges to be filed.

We therefore hold that the court erred in its decision that selective prosecution is a bar to reprosecution of Mulholland and Albert. Having determined that reprosecution is not barred by either double jeopardy or selective prosecution, we next address the final two issues presented by the Commonwealth, specifically, the proper venue and venire of the reprosecution and who will conduct the reprosecution. Both issues appear to present questions of first impression.

First, the Commonwealth argues that venue and venire revert to the county in which the complaint was originally filed when a mistrial occurs after a change of venue or venire has been granted. The general rule is that when reprosecution subsequent to the grant of a motion for mistrial is not barred, the proceedings revert to a pretrial status as though the original "trial had never occurred." *Commonwealth v. James*, 506 Pa. 526, 486 A.2d 376, 379 (1985). However, this court has held that not all of the original trial court's pretrial rulings are subject to relitigation. *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326 (1995). In *Starr*, we held that rulings relating to legal questions determinative of the "law of the case" should not be reopened. *Id.* 664 A.2d at 1331.

The grant or denial of a motion for a change of venue or venire does not fall within the category of a legal question

that is determinative of the law of the case.[6] This becomes readily apparent through examination of the standards used by a trial court to decide whether such a motion should be granted, and the implicit underlying rationale of these standards. Exercising its discretion in considering a motion for change of venue or venire, a trial court must take the following factors into account:

> whether the publicity was sensational, inflammatory, and slanted toward conviction rather than factual and objective; whether the publicity revealed the accused's prior criminal record, if any; whether it referred to confessions, admissions, or reenactments of the crime by the accused; and whether such information is the product of reports by the police or prosecuting officers.

*Commonwealth v. Chambers*, 546 Pa. 370, 685 A.2d 96, 103 (1996). The court must also consider whether "there was a sufficient lapse of time for the effects of the adverse publicity to dissipate." *Id.* 685 A.2d at 103. These standards serve the purpose of ensuring that adverse publicity will not unduly prejudice a jury in determining the guilt or innocence of a criminal defendant.

Clearly, for the above standards to have any reasonable relation to the underlying rationale of ensuring that publicity does not unduly prejudice a defendant's opportunity for a fair trial, they must be applied at the time of the trial. As time elapses, the media attention given any particular trial will vary in content as well as pervasiveness. The attendant circumstances surrounding a particular trial which give rise to media interest will also vary with time. It certainly cannot be said that the facts and issues involved with the question of venue or venire will be substantially the same when this case is retried as they were in April, 1996, when the question was originally addressed.

6. "It is an essential element of the doctrine of the law of the case that it applies only where the facts and issues on the subsequent [trial] are substantially the same as those involved [in prior proceedings]." 5 Am.Jur.2d Appeal and Error § 748.

Pa.R.Crim.P. 312(a) is also instructive. The rule states, in pertinent part, that "[a]ll motions for change of venue or for change of venire shall be made to the court in which the case is currently pending." *Id.* The comment following the rule states:

As used in paragraph (a) of this rule, "court in which the case is currently pending" will ordinarily refer to the court or the county in which the complaint was filed. However, when a change of *venue* has been previously ordered, the case would be considered pending in the court or county to which the case had been transferred.

*Id.* (Emphasis added.) In this case venue never changed from Allegheny County; only venire changed. The case is, therefore, pending in Allegheny County.

Since, as previously mentioned, the proceedings have reverted to a pretrial status, and since the question of venire is not one which is determinative of the law of the case (and may therefore be relitigated), all motions of venue or venire must be addressed to the court in which the complaint was filed, i.e., the Court of Common Pleas of Allegheny County.

 The final issue is whether the trial court exceeded its authority when it removed the District Attorney of Allegheny County and substituted the Attorney General of Pennsylvania as prosecutor in any subsequent proceedings. The trial court in this case removed the district attorney based upon the allegations of misconduct which have been addressed previously in this opinion. We will first discuss whether the substitution of the attorney general was within the trial court's authority, and then address the court's removal of the district attorney.

The Commonwealth Attorneys Act describes the circumstances in which the attorney general may prosecute a criminal case. The act provides, in pertinent part, that the attorney general has the power to prosecute in the following cases:

(3) *Upon the request of a district attorney* who lacks the resources to conduct an adequate investigation or the prosecution ... represents ... the potential for an actual or

apparent conflict of interest on the part of the district attorney or his office.

(4) *The Attorney General may petition the court* having jurisdiction over any criminal proceeding to permit the Attorney General to supersede the district attorney.... Upon the filing of the petition, the *president judge* shall request the Supreme Court to assign a judge to hear the matter. The judge assigned shall hear the matter ... and make a determination as to whether to allow supersession.... Supersession shall be ordered if the Attorney General establishes by a preponderance of the evidence that the district attorney has failed or refused to prosecute and such failure or refusal constitutes abuse of discretion.

(5) When *the president judge ... has reason to believe that the case is a proper one for the intervention of the Commonwealth, he shall request the Attorney General to represent the Commonwealth ...* and prosecute the defendant. If the Attorney General agrees that the case is a proper one for intervention, he shall file a petition with the court and proceed a provided in paragraph (4). *If the Attorney General determines that the case is not a proper case for intervention, he shall notify the president judge accordingly.*

71 P.S. § 732–205(a)(3)–(5) (emphasis added).

██ We have held that the powers of the attorney general are strictly limited and are solely a "matter of legislative designation and enumeration." *Commonwealth v. Carsia,* 512 Pa. 509, 517 A.2d 956, 958 (1986).[7] In other words, the attorney general may intervene in criminal prosecutions only in accordance with provisions enumerated by the legislature.[8]

7. In contrast to the statutory limitations placed upon the attorney general's ability to prosecute criminal cases, 16 P.S. § 4402(a) sets forth the duties of district attorneys providing, inter alia, that: "[t]he district attorney shall sign *all* bills of indictment and conduct in court *all* criminal and other prosecutions, in the name of the Commonwealth, ... which arise in the county ..." in which he is elected. *Id.* (Emphasis added.)

8. Sources of the attorney general's powers include, e.g., the Commonwealth Attorneys Act, 71 P.S. § 732–101 et seq.; Wiretapping and

Nowhere does the record reflect either that the district attorney requested the attorney general's intervention or that there existed a potential conflict of interest. Neither does the record show that the attorney general petitioned the court to supersede the district attorney. Finally, nothing in the record suggests that the president judge of Allegheny County requested the attorney general to prosecute this case. Rather, the trial judge, sua sponte, entered an order mandating the removal of the district attorney and the substitution of the attorney general, completely circumventing the statutorily prescribed procedure for requesting intervention of the attorney general.

With regard to the district attorney, the trial judge rationalized his removal by asserting a "cloud of conflict of interest and the suspicion that the interests of justice are not being served," referring to standards set forth in *Commonwealth v. Eskridge*, 529 Pa. 387, 604 A.2d 700 (1992).[9] This assertion of conflict of interest is unsupported in the record. Even if such a conflict did exist, the proper course of action would have been for the trial judge, through the president judge, to request the attorney general's intervention in accordance with the statutory provisions of the Commonwealth Attorneys Act.[10]

For the foregoing reasons, we affirm the trial court's order insofar as it held that double jeopardy does not act as a bar to reprosecution. With respect to all other issues, those raised

Electronic Surveillance Control Act, 18 Pa.C.S. § 5724; and Criminal History Record Information Act, 18 Pa.C.S. § 9141. The latter two statutes do not, however, empower the attorney general to intervene in criminal prosecutions.

**9.** *Eskridge* stands for the proposition that a conflict of interest exists when the district attorney has a pecuniary interest in the outcome of a criminal proceeding, and is, therefore, distinguishable from the present case. *See also Commonwealth v. Breighner*, 453 Pa.Super. 477, 684 A.2d 143 (1996).

**10.** Interestingly, even if the statutory procedure had been complied with, there would have been no guarantee that the attorney general would have intervened. If the attorney general did not agree that the case was proper for intervention, he would have merely notified the president judge of his determination and the case would be returned, presumably, to the district attorney.

by the Commonwealth, the order is reversed, and the case is remanded for retrial.

## ORDER

PER CURIAM.

AND NOW, this 10th day of October, 1997, it is hereby ordered that:

(1) the order of the court of common pleas, holding that retrial is not barred by principles of double jeopardy, is affirmed;

(2) the order of the court of common pleas, holding that retrial is barred due to selective prosecution, is reversed;

(3) the order of the court of common pleas, holding that the question of venue and venire cannot be relitigated, is reversed;

(4) the order of the court of common pleas, removing the district attorney's office and substituting the attorney general's office in all subsequent proceedings, is reversed;

(5) the cases are remanded to the Court of Common Pleas of Allegheny County for retrial; and

(6) the Honorable James E. Rowley, former president judge of the Superior Court of Pennsylvania, is herewith designated to preside over the trial and all matters related thereto.

CASTILLE, J., files a concurring and dissenting opinion.

CASTILLE, Justice, concurring and dissenting.

The majority correctly remands this case to the Court of Common Pleas of Allegheny County for retrial. Nevertheless, I write separately only to note my disagreement with the majority's *sua sponte* decision to appoint a judge to preside over the case who is not a member of the Allegheny Court of Common Pleas. This matter involves allegations of improper conduct by police officers from Allegheny County resulting in the death of Jon E. Gammage at a location within Allegheny County. Since the matter is to be remanded to the Court of Common Pleas of Allegheny County, it should be directed to

the President Judge of the county to assign another judge from that county to preside over the trial.

While I agree with the majority's *sub silentio* removal of the particular Allegheny County trial judge who originally presided over this matter (given the various pronouncements that he has made of record in this matter), the parties to this matter have not asked for the recusal of any member of the Allegheny County bench and there are no facts of record which would demonstrate that other members of the distinguished bench of Allegheny County would be unable to preside over this matter, notwithstanding the controversial nature of the charges. Therefore the special appointment of the former president judge of the Superior Court to preside over the retrial of this matter is wholly unnecessary at this juncture.