J-S59028-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DARON MARTIN | : | |
| | : | |
| Appellant | : | No. 138 EDA 2017 |

Appeal from the Judgment of Sentence December 5, 2016
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0007083-2014,
CP-46-CR-0008081-2014

BEFORE: BENDER, P.J.E., OTT, J., and FITZGERALD, J.*

MEMORANDUM BY OTT, J.:                    **FILED DECEMBER 20, 2017**

Daron Martin appeals from the judgment of sentence imposed December 5, 2016, in the Montgomery County Court of Common Pleas. Martin was sentenced to an aggregate term of four to eight years' imprisonment, following his conviction of persons not to possess firearms, burglary, conspiracy, receiving stolen property ("RSP") and theft.[1] On appeal, he challenges the sufficiency of the evidence supporting his convictions of burglary and

---

* Former Justice specially assigned to the Superior Court.

[1] **See** 18 Pa.C.S. §§ 6105(a)(1), 3502(a)(2), 903(a)(1), 3925(a), and 3921(a), respectively.

conspiracy, and asserts prosecutorial misconduct based upon allegations of selective prosecution and vindictiveness.[2]  For the reasons below, we affirm.

The facts underlying Martin's conviction were summarized by the trial court as follows:

> At trial, the Commonwealth moved into evidence a certified copy of [Martin's] prior conviction for Burglary.  Then, Mr. Joseph Anderson testified that he lived at 312 Newington Drive in Hatboro, Pennsylvania with his wife, Wendy and son, Christopher.  Mr. Anderson identified the items in Commonwealth exhibit 2 A-C which Mr. Anderson testified depicted his weapons:  his 20 gauge shotgun bolt action which had the bolt on the right side, a .22 caliber semi-automatic carbine with a pinkish hue, and a white gun case in which Mr. Anderson stored his weapons.  Mr. Anderson testified that there were distinctive features or markings that made it possible for him to identify the rifles as his.  These weapons were kept by Mr. Anderson in the back of his bedroom closet, buried to keep anyone from finding them.  Mr. Anderson discovered these guns missing on August 28, 2014, about three weeks after he had last checked the closet and had seen the shotguns.  Mr. Anderson also discovered a change jar and small lockbox missing.  There was also ammunition missing and the cash taken was worth a few hundred dollars.  Mr. Anderson identified Commonwealth exhibit 3 as shotguns shells which were identical to those taken from his home.  Finally, Mr. Anderson never got the rifles, case, money, or lockbox back and he never gave anyone permission to take those items or enter the bedroom.

> Christopher Anderson, the son of Joseph Anderson, testified that he lived with his father and that on August 20, 2014, Dustin Vorndran was at his house in the afternoon.  Vorndran and Christopher were in his bedroom splitting a bag of heroin while

---

[2] We note Martin also appealed his sentence imposed at Docket No. 7083-2014, following a guilty plea to one count of possession with intent to deliver heroin.  On December 5, 2016, the trial court sentenced Martin to a term of one and one-half to three years' incarceration, followed by two years' probation, and imposed that sentence to run concurrently to the sentence imposed on the burglary conviction.  However, none of the claims raised on appeal apply to the drug conviction.

Christopher's mother was downstairs. At one point, Vorndran left and said he was going up the street to meet with [Martin]. When Vorndran came back, he just walked back into the house because Christopher had told him to come right back in. Vorndran told Christopher that [Martin] wanted to meet with him, so Christopher left Vorndran in his room and went 300-400 feet up the street to speak with [Martin,] who told Christopher he had pills he wanted to sell. When Christopher spoke to [Martin], he was in an orange sedan with two other people, a man and a woman named Grace. Christopher returned five to eight minutes later and Dustin Vorndran was sitting in his room, where they split another bag of heroin. Vorndran then asked Christopher to distract his mother so he could meet [Martin] who was going to pull up to the house. Christopher left his room and distracted his mother while Dustin Vorndran eventually left through a back door where he entered the orange sedan. Christopher had never given permission for Dustin Vorndran or anyone to take anything from inside the house. Up until that point, Vomdran was regularly at the house of Christopher until August 20, 2014, and the family even had a shed in which he sometimes stayed. Christopher had never given Dustin Vorndran any money for the heroin they shared together.

Detective Richard Beaghley testified that he extracted information from a HTC One silver phone with a black case which counsel stipulated was found on [Martin's] person and was the phone from which police extracted data. Detective Schramm went through the information obtained from the phone and discovered text messages from August 20, 2014 which were contained in Commonwealth exhibit C-5. Dustin Vorndran was sometimes called "Redz" and Christopher was sometimes called "Heron." There were texts recovered from the phone between Redz, identified by Christopher Anderson to be Dustin Vorndran, with [Martin]. The following texts were exchanged between Redz (identified with a V for Dustin Vorndran) and [Martin] (identified with a D [for "defendant"]) on August 20, 2014 between the hours of 6:39:43 PM and 8:36:07 PM:[3]

V: yo bro. in to crib now. moms outside gardening. Just gotta get em to leave so gimmiw a lil to get this goin.
far so good tho.

---

[3] The texts were transcribed in their entirety, which included spelling and grammatical errors.

im gonna have to get em to go outside for something ill be too loud if hes inside so ima have em go to the shed looking good so far.

D: Ok.
Dnt fuck. up.

V: what you mean

D: lol get the bread lol

V: if u mean gettin the bread than just let me work it out. but if you mean like disapearing than u aint gotta worry. even if i don't get it for whatever reason than im still coming back.

D: Ok

V: i ard told em what up like I said "darons comin down soon to give ya a lil something for everything that happened nd shit"

D: ok wat he say we still at the same spot right now

V: the same spot u dropped me at?

D: Yea we didnt leave yet

V: im gonna see if maybe hell walk to the in &out and meet u himself. thatll gimmie plenty of time ya feel me?

D: But u dont need it. that will. be fishy just ask. for something. out th shed and say weneed it for something. we about to. do

V: i did but he also went down stairs real quick and when he did I went to scope out the bread but they musta stuck it further in the closet it looks like im gonna have to fish around for it and find the fuckin thing
what u mean mean i don't need it? it aint even for me!?! Lol

D: Oo ok dam an im.talking about the time rd send him out to talk to me where we at

V: okay i did. but i said youll be there in like 3-5 mins cuz i didnt wanna make it fishy

D: Ok

V: hes gonna leave in like a min. and i told em to get change cuz he wanted to get a cig from ant or grace so i was like "get a dollar in change so you can just buy it" that way i can watch where he goes to get it ya mean?
here he comes

D: ok
U get it he on his way

V: keep him for a min man

D: He left quick tried convo.

V: still wit em?

D: He there

V: damn man wtf that was so fast fuck mab

D: i kno tell come here so i can.ask.about the mlrphine pills

V: all.i.did was reach my hand in this change jawn. and got a buncha change in my pocket

D: No bills??

V: shit alright man. fuck.it was so.drawlin he walked in while i was goin ham lmao

D: lol

V: couldnt find the bills jawn lol

D: Damn

V: hold. up. convinciing him to. go back out lmao

D: do u kno.where to look

V: yeah in his dad room in.one of the closets sorry for takin a min. tell them im sorry for the wait. at least i got gas bills or that bad covered in changeep your eye out for me

D: Ok

V: hes finishing his bag than goin out

D: Ok

V: at first he was like "tell em to just txt me" i said he has like 10 mins left on his phone lol

D: lmao

V: this is a hard one i cant lie hahaha but at least ill walk out with SOMETHING rather than nothing

D: Tru but if u find it that would.lovely

V: ight hell be walking out in the next 2-3 mins. canu see if his moms still outfront yo? i cant tell and i.dont wanna ask to draw attention

D: I dont c her

V: and yeah i know i know mannn trust me...i know. but im doin my best. the first time was sooooooo drawlin lol that almost gave up everything. i left the door wide open. he has not noticied that yet lol. i hope this tine works

D: Ok

V: ok well im gonna have to be EXTRA sneaky just let me know when he leaves this time. last time caught me.off gaurd. i thought youd talk to em for a good 5-10 mins lol i didn't think itd be that quick man

D: I tried

V: hes finishing his cig now. make this one last a lil longer please

D: ok

V: just do.ya.best to make it last. his mom is bouta take the dogs outback in a sec. soon as she does ima send him out so ill be completley alone again

D: Ok

V: he comin
he good?
i got a safe, i.dont have the.key but we can bust it open, sonds like something good.inside man.i.hope

whats goin on??

D: Ok well he might
Talking

V: okay i gotba lil safe

D: He coming now

V: give em a morphine, i think.the safe may be good

D: I dont have it on me

V: okay. im chillin. gotta big ass safe in my pants lmao
we gonna have to bust it open

D: Lol
ok

V: so drawlin lmai

D: Lol

V: comin out in a sec

D: rdv

V: gotta get em to distract his mom for me

D: ok

V: wait. did his mom leave by any chance??
i hope something good in this jawn Lmao

D: i kno
Wya

V: comin

D: they getting irritated

V: ok my bad

D: Let the games begin

Additionally, there were texts between [Martin] and a person called KKK on August 20, 2014 between 7:20:02 PM and 8:29:02 PM.

D: Wyd

KKK: Just got off work
Wyd?

D: Getting guns

KKK: What kind?

D: Shotgunz

KKK: For how much

D: Free

Finally, there were texts between [Martin] and a person named Porsha between 7:20:10 PM and 7:50:56 PM:

D: Hey, cuz

P: Hey counsin wyd?

D: Wyd

P: Watching tv tryna borrow money u? How's the babys

D: Tryna steal money

Police executed a search warrant on [Martin's] home where they found three 20 gauge shot gun shells, the same shells that Joseph Anderson identified in Commonwealth exhibit 2 as being identical to ammunition which was stolen. Police also recovered the photos depicted in Commonwealth exhibit 2 as being taken on [Martin's] phone August 21, 2014, the same pictures depicting guns Joseph Anderson identified as having been stolen from him. Additionally, there were photos of [Martin] on the phone in the form of selfies identified in Commonwealth exhibit 6.

Finally, Grace Mitchell testified that in late August of 2014 she drove her bright orange Chevy Cobalt to a "neighborhood off Newington", a block away from the house of someone Vorndran knew. She stated that Vorndran and [Martin] were in the car with her and that she then drove to Heron's house. Heron was

identified as the street name for Christopher Anderson. Grace Mitchell testified that Heron left the house and spoke to [Martin], that [Martin] was on his phone while sitting in the car, and that after the first conversation with Vorndran, Dustin Vorndran entered Heron's house and then came out a little while later. She testified that Dustin then reentered the house and when he came out again he had two rifles and a little safe. The rifles were inside white bags or cases, and Vorndran claimed they were collateral for money he couldn't get. Grace Mitchell then drove to [Martin's] house and left the keys with Vorndran. When Grace Mitchell had given a statement in September of 2014 she stated that she saw [Martin] holding a gun although at trial she was less sure. However, Grace Mitchell also testified that she knew the guns were going to [Martin] which was why they went to his house and took out the guns. Grace Mitchell originally believed they were going to Heron's house to collect on a debt and that she might get money for helping.

Trial Court Opinion, 3/17/2017, at 2-7 (record citations omitted).

As noted above, Martin was subsequently arrested and charged with persons not to possess firearms, burglary, conspiracy to commit burglary, receiving stolen property and theft. Although similar charges filed against Vorndran were initially consolidated for trial, on September 3, 2015, Vorndran entered a guilty plea to one count of burglary. He was sentenced that same day to a term of one to three years' incarceration.

Martin's case proceeded to a non-jury trial conducted on February 8, 2016. At the conclusion of the trial, the court found him guilty of all charges. On December 5, 2016, the trial court imposed the following sentence: (1) on the charge of persons not to possess firearms, a term of four to eight years' imprisonment; (2) on the charge of burglary, a concurrent term of one and one-half to five years' imprisonment; and (3) on the charge of conspiracy, a

concurrent term of one and one-half to five years' imprisonment.[4]  This timely appeal followed.[5]

In his first issue on appeal, Martin contends the evidence was insufficient to support his convictions of burglary and conspiracy to commit burglary.[6]  **See** Martin's Brief at 17-27.  Our review of a challenge to the sufficiency of the evidence is well-settled:

> [W]e must determine whether the evidence admitted at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict-winner,

---

[4] The court found Martin's conviction of theft and RSP merged for sentencing purposes.

[5] On December 30, 2016, the trial court ordered Martin to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).  Martin filed a preliminary concise statement on January 5, 2017, but also requested an extension of time to file a final statement since the notes of testimony from the sentencing hearing had not been transcribed.  By order entered January 6, 2017, the court "granted in part" Martin's request, and directed that a final statement be filed no later than February 5, 2017.  Order, 1/6/2017.  Martin then filed an interim supplemental statement on January 17, 2017, raising an additional claim concerning the admission of certain evidence.  That same day, Martin filed a motion requesting the court vacate its January 6, 2017, concise statement order because the court reporter for the sentencing hearing was not responding to Martin's request for a transcript.  Thereafter, on January 18, 2017, the trial court entered an order vacating its January 6, 2017, order and directing Martin to file a final concise statement 20 days from receipt of the sentencing hearing transcript.  The docket for Martin's companion case (7083-2014) reveals the sentencing transcript was filed on January 26, 2017.  Martin did not file any additional supplemental concise statements after that time.

[6] Martin does not challenge his conviction of persons not to possess firearms, RSP, or theft.

- 10 -

supports all of the elements of the offense beyond a reasonable doubt. In making this determination, we consider both direct and circumstantial evidence, cognizant that circumstantial evidence alone can be sufficient to prove every element of an offense. We may not substitute our own judgment for the [fact-finder's], as it is the fact-finder's province to weigh the evidence, determine the credibility of witnesses, and believe all, part, or none of the evidence submitted.

*Commonwealth v. Sanchez*, 82 A.3d 943, 972 (Pa. 2013) (internal citations omitted), *cert. denied*, 135 S.Ct. 154 (U.S. 2014).

A person is guilty of burglary "if, with the intent to commit a crime therein, the person … enters a building … that is adapted for overnight accommodations in which at the time of the offense no person is present[.]" 18 Pa.C.S. § 3502(a)(2). Although it is a defense to the crime if the defendant was "licensed or privileged to enter" the building,[7] "[a]ny license or privilege to enter a premises is negated when it is acquired by deception." *Sanchez*, *supra*, 82 A.3d at 973.

In order to secure a conviction of criminal conspiracy,

the Commonwealth must establish that a defendant entered into an agreement to commit or aid in an unlawful act with another person or persons, with a shared criminal intent, and an overt act was done in the conspiracy's furtherance. 18 Pa.C.S. § 903[.] The overt act need not accomplish the crime-it need only be in furtherance thereof. In fact, no crime at all need be accomplished for the conspiracy to be committed. In most cases of conspiracy, it is difficult to prove an explicit or formal agreement; hence, the agreement is generally established via circumstantial evidence, such as by "the relations, conduct, or circumstances of the parties or overt acts on the part of co-conspirators."

*Id.* (some citations omitted).

---

[7] 18 Pa.C.S. § 3502(b)(3).

- 11 -

Furthermore, we note that:

Once there is evidence of the presence of a conspiracy, conspirators are liable for acts of co-conspirators committed in furtherance of the conspiracy. Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy.

The general rule of law pertaining to the culpability of conspirators is that each individual member of the conspiracy is criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy. The co-conspirator rule assigns legal culpability equally to all members of the conspiracy. **All co-conspirators are responsible for actions undertaken in furtherance of the conspiracy regardless of their individual knowledge of such actions and regardless of which member of the conspiracy undertook the action.**

The premise of the rule is that the conspirators have formed together for an unlawful purpose, and thus, they share the intent to commit any acts undertaken in order to achieve that purpose, regardless of whether they actually intended any distinct act undertaken in furtherance of the object of the conspiracy. It is the existence of shared criminal intent that "is the sine qua non of a conspiracy."

*Commonwealth v. Lambert*, 795 A.2d 1010, 1016–1017 (Pa. Super. 2002) (internal citations omitted and emphasis supplied), *appeal denied*, 805 A.2d 521 (Pa. 2002).

In the present case, Martin insists the evidence was insufficient to support his conviction of burglary because Vorndran "clearly had license, privilege and permission to go in and out of" Anderson's home. Martin's Brief at 20. He emphasizes Anderson welcomed Vorndran in the home that day to do drugs, and he had stayed overnight in the family's shed on prior occasions. *See id.* Furthermore, Martin argues Vorndran did not use deception to gain

entrance to the home; rather, "the only deception involved [was] used to commit the theft when [Anderson] agreed to distract his mother so she wouldn't see Vorndran leave with the items of stolen property[.]" *Id.* at 21.

With regard to his conviction of conspiracy, Martin contends that while the evidence was sufficient to establish he "knew Vorndran was going to steal money," the evidence did not support the court's conclusion that Martin "conspired to commit the crime of burglary"[8] or that he agreed to steal firearms. *Id.* at 22. Indeed, Martin maintains "the theft of the guns appears to have been an opportunistic act on the part of Vorndran that came about as he searched for the change jar." *Id.* Accordingly, he asserts the evidence was insufficient to support his convictions of burglary and conspiracy.

The trial court, which sat as fact-finder, found the Commonwealth proved beyond a reasonable doubt Martin and Vorndran "had an agreement to steal money," which led to the theft of money and firearms. Trial Court Opinion, 3/17/2017, at 13. Based upon the text messages recovered from Martin's cell phone, the court determined there was "clear evidence of an agreement to go to the home of Christopher Anderson and steal."[9] *Id.* Moreover, as a result of this conspiratorial agreement, the court determined Martin was "liable for all actions undertaken by Vorndran in furtherance of the

---

[8] Martin claims "there was no agreement between the two that Vorndran would enter the premises by subterfuge or other illegal means." Martin's Brief at 23.

[9] *See* N.T., 2/8/2016, at 68-69 (text messages between Vorndran and Martin; Vorndran indicates he is in the house and will convince Anderson to leave so he can search for the money, and Martin responds, "Okay. Then don't fuck up … LOL. Get the bread. LOL.").

conspiracy to enter the house and steal." **Id.** Furthermore, the trial court also concluded Vorndran gained entrance to the house through deception. **See id.** at 14. The court explained:

> Here, Christopher Anderson invited Dustin Vorndran into the house to do drugs together, and hang out. [T]he true prupose of Dustin Vorndran's entrance was concealed, and that deception is enough to negate any purported license or privilege that Vorndran had. The deception was used to gain entrance to the house of the victim, not to steal.

**Id.** at 15. Accordingly, the court determined there was sufficient evidence to support Martin's convictions of burglary and conspiracy to commit burglary.

We find the trial court's verdict is supported by the evidence. Grace Mitchell testified that she, Martin, and her boyfriend Anthony Lochetto dropped Vorndran off at Anderson's house. **See** N.T., 2/8/2016, at 86-88. She explained that Lochetto told her before the trip Vorndran owed Martin money, and Vorndran "said that he was collecting money off of [Anderson]." **Id.** at 89, 95. She also explained that Vorndran and Martin had a private conversation outside the car before they drove to the Andersons'. **See id.** at 96. Accordingly, this testimony, coupled with the text messages exchanged between Vorndran and Martin supports the court's finding that the two men conspired to steal money from Anderson, and agreed Vorndran would enter the home under the guise of bringing Anderson drugs.

The Supreme Court's decision in **Sanchez** is instructive. In that case, the defendant and two co-defendants agreed to assault Mendez Thomas. **See Sanchez**, **supra**, 82 A.3d at 951. One of the co-defendants called Thomas

- 14 -

and arranged a meeting "under the ruse of wanting to procure marijuana." *Id.* When they arrived at Thomas's apartment, he and his girlfriend, Jessica Carmona, were not home, but Carmona's sister, Lisa Diaz, who was the girlfriend of one of the co-defendant's, permitted them to enter the apartment, unaware of their true intent. *See id.* After Thomas and Carmona returned, the defendant and Thomas got into an altercation, and the defendant shot and killed Thomas and Diaz. Carmona survived the attack. *See id.*

> In affirming the judgment of sentence, the Supreme Court opined:

> [T]he jury could reasonably have concluded that all the elements of burglary and conspiracy to commit burglary had been established beyond a reasonable doubt. In other words, from the trial evidence, the jury could have reasonably concluded that by acting in concert pursuant to an agreed-upon plan, [the two co-defendants] helped Appellant gain unprivileged entry into the premises, by deception, with the shared intent to commit a crime therein.

*Id.* at 974. *See also Commonwealth v. Edwards*, 903 A.2d 1139, 1147-1148 (Pa. 2006) (affirming defendant's burglary conviction where defendant gained entry into victim's home by deception, telling victim he was there to pay for previously stolen drugs), *cert. denied*, 549 U.S. 1344 (2007).

The facts in the present case are similar to those in *Sanchez*. Although Anderson invited Vorndran into his home, Vorndran entered under the pretense of doing drugs, when, in actuality, he and Martin had conspired to steal money from Anderson. Therefore, Vorndran's license to enter was negated by his deception. Further, both Mitchell's testimony and the text messages, exchanged between Martin and Vorndran, establish the two men

agreed that Vorndran's purpose in entering the home was to steal from Anderson. The fact that Martin and Vorndran discussed how they would lure Anderson from the home supports the court's finding that Martin agreed Vorndran would gain entry to the home through deception, that is, under the ruse of drug use. Moreover, while it is unclear if the conspiratorial agreement included the theft of firearms,[10] we remind Martin that all co-conspirators "share the intent to commit any acts undertaken in order to achieve [the] purpose [of the agreement], regardless of whether they actually intended any distinct act undertaken in furtherance of the object of the conspiracy." **Lambert**, **supra**, 795 A.2d at 1017 (citation omitted). Accordingly, Martin's first issue fails.

In his second issue, Martin claims he was the subject of selective prosecution and/or prosecutorial vindictiveness.

"Because of the doctrine of separation of powers, the courts will not lightly interfere with an executive's decision of whom to prosecute." **Commonwealth v. Murphy**, 795 A.2d 997 (Pa. Super. 2002) (citation omitted).

> To establish selective prosecution, an appellant has the burden of satisfying the two-pronged test set forth by the Pennsylvania Supreme Court in **Commonwealth v. Mulholland**, 549 Pa. 634, 702 A.2d 1027 (1997). An appellant must demonstrate "first, [that] others similarly situated were not

---

[10] We note Martin texted "KKK" that he was "[g]etting guns" for "[f]ree." N.T., 2/8/2016, 74, 75. However, it is unclear whether this conversation took place before or after Vorndran first entered Anderson's home.

prosecuted for similar conduct, and, second, the Commonwealth's discriminatory selection of [him] for prosecution was based on impermissible grounds such as race, religion, the exercise of some constitutional right, or any other such arbitrary classification." ***Id.*** at 649, 702 A.2d at 1034 (citing ***Wayte v. United States***, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)).

***Commonwealth v. Olavage***, 894 A.2d 808, 811 (Pa. Super. 2006), *appeal denied*, 907 A.2d 1102 (Pa. 2006). "Unequal application of the criminal laws alone does not amount to a constitutional violation." ***Commonwealth v. Wells***, 657 A.2d 507, 510 (Pa. Super. 1995) (quotation omitted), *appeal denied*, 668 A.2d 1131 (Pa. 1995). Similarly, "[t]he defense of prosecutorial vindictiveness is based upon the theory that due process prohibits a prosecutor from punishing a criminal defendant in retaliation for that defendant's decision to exercise a constitutional right." ***Commonwealth v. Butler***, 601 A.2d 268, 270 (Pa. 1991) (quotation omitted).

Here, Martin argues he was "selectively and vindictively prosecuted" because he is African-American, and choose to fight the charges at trial. Martin's Brief at 28. He emphasizes that all of the other people involved in the crime – Vorndran (who actually stole the guns), Mitchell (who drove the getaway vehicle), and Lochetto (who was in the vehicle) – are white. ***See id.*** He also notes neither Mitchell nor Lochetto were charged with any crimes, and although Vorndran was prosecuted for his participation, he was offered a very favorable plea to one count of burglary and was sentenced to one year in prison. ***See id.*** at 29. Martin explains:

> [T]he harsher treatment imposed upon [him] can only be explained by his decision to fight the burglary and conspiracy to

commit burglary charges. [His] only reason for going to trial was the excessively differential treatment he received compared to the other participants who were all white.

*Id.* at 30-31.

The Commonwealth asserts Martin's claim is waived. We agree. The proper means to assert prosecutorial misconduct based upon selective prosecution or vindictiveness is by raising the claim in a pretrial motion to dismiss. *See Butler*, *supra*, 601 A.2d at 270-271. As the *Butler* Court explained, "a claim of prosecutorial vindictiveness, like claims of other types of prosecutorial misconduct, addresses itself to a concern that official misconduct should prevent the institution or prosecution of criminal charges against the defendant." *Id.* at 271 n.3. Accordingly, because Martin raised this claim for the first time in his preliminary concise statement, we find it is waived on appeal.[11]

Judgment of sentence affirmed.

---

[11] We note the issue, as framed in the concise statement, asserts only a claim of selective prosecution based upon Martin's race, and not prosecutorial vindictiveness based upon his decision to proceed to trial. *See* Preliminary Concise Statement, 1/5/2017, at 2-3. *See also* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the [Concise] Statement … are waived.").

Nonetheless, even if this issue were properly preserved, we find the trial court sufficiently addressed and properly disposed of this claim in its opinion. *See* Trial Court Opinion, 3/17/2017, at 18-21 (finding Martin and the other potential defendants were not similarly situated; that Martin was the "initiator and director of the criminal activity"; and that Martin presented no evidence his treatment was "racially motivated.").

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/20/2017