J-S65005-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| TYRONE ARMSTRONG | |
| Appellant | No. 1803 EDA 2013 |

Appeal from the Judgment of Sentence May 6, 2013
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0006618-2011

BEFORE: PANELLA, J., OLSON, J., and PLATT, J.[*]

MEMORANDUM BY PANELLA, J.                    **FILED DECEMBER 23, 2014**

Appellant, Tyrone Armstrong, appeals from the judgment of sentence entered by the Honorable Patricia H. Jenkins, Court of Common Pleas of Delaware County, arising from drug trafficking charges prosecuted by the Pennsylvania Office of the Attorney General. After careful review, we affirm in all aspects save for the legality of the sentence imposed. As the trial court cogently noted in its opinion on appeal, the sentence imposed is illegal under the subsequently published opinion in **Alleyne v. United States**, and therefore must be vacated and remanded for resentencing.

This case arises from the Office of the Attorney General's investigation into a crack cocaine distribution ring headed by Lester Womack. Armstrong

---

[*] Retired Senior Judge assigned to the Superior Court.

concedes that "[t]here is not much question that Lester Womack was the head of a drug distribution operation." Appellant's Brief, at 11. Furthermore, it is not disputed that the majority of evidence supporting the charges against Armstrong was circumstantial. Armstrong was never found with crack cocaine in his possession, nor was any retrieved from persons who claimed to have bought from him. The evidence against Armstrong consisted primarily of his statements in recorded phone calls with known members of the distribution ring, as well as Armstrong's appearance at a bar that was a center of activity for Womack's distribution ring after allegedly requesting, in slang terms, to purchase an ounce of crack cocaine.

After a trial, a jury convicted Armstrong of one count of Corrupt Organizations, three counts of Criminal Conspiracy, one count of Dealing in Proceeds of Illegal Activity, one count of Criminal Use of a Communication Facility, and one count of Possession with Intent to Deliver Cocaine. The trial court subsequently imposed a seven to fourteen year mandatory minimum sentence for the Possession with Intent to Deliver charge, to be served consecutively to concurrent twelve to twenty-four month sentences on the remaining charges, yielding an aggregate sentence of eight to sixteen years of imprisonment. This timely appeal followed.

In his first issue on appeal, Armstrong argues that the evidence presented at trial does not support his convictions. When determining if

evidence is sufficient to sustain a conviction, our standard of review is well-settled:

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Kendricks*, 30 A.3d 499, 508 (Pa. Super. 2011) (citation omitted).

> The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented. It is not within the province of this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder. The Commonwealth's burden may be met by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Stokes*, 38 A.3d 846, 853 (Pa. Super. 2011) (quoting *Commonwealth v. Mobley*, 14 A.3d 887, 889-890 (Pa. Super. 2011)). "[T]he entire record must be evaluated and all evidence actually received must be considered." *Id*., 38 A.3d at 854.

After reviewing the certified record, transcripts, appellate briefs of the parties, and the opinion of the trial court, we conclude that trial court thoroughly reviewed the evidence at trial and comprehensively addressed

the arguments raised by Armstrong. *See* Trial Court Opinion, 12/18/13, at 2-10, 19-29. We therefore affirm on the basis of the trial court's well-written opinion.

In his second issue on appeal, Armstrong contends that the trial court erred in permitting transcripts of recorded telephone conversations to go to the deliberation room with the jury. The trial court relied upon *Commonwealth v. Bango*, 742 A.2d 1070 (Pa. 1999), in ruling that the transcripts would be allowed to go to the deliberation room for the jury to review. Armstrong acknowledges that the trial court issued cautionary instructions informing the jury that the tapes were the evidence, and that the transcripts were no more than an aid in analyzing the tapes. *See* Appellant's Brief, at 18. Armstrong, however, argues that *Bango* is inapposite, as he alleges that the tapes in this case were "almost indecipherable, and unfortunately, the jury was left with what they saw, not with what they heard." *Id*.

We cannot reach the merits of this claim, as the tapes in question are not in the certified record. Ordinarily, we can only consider documents which are part of the certified record. *See Roth Cash Register Company, Inc. v. Micro Systems, Inc.*, 868 A.2d 1222, 1223 (Pa. Super. 2005). Furthermore, "[i]t is the obligation of the appellant to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on

appeal." ***Everett Cash Mutual Insurance Company v. T.H.E. Insurance Company***, 804 A.2d 31, 34 (Pa.Super. 2002) (quoting ***Hrinkevich v. Hrinkevich***, 676 A.2d 237, 240 (Pa.Super. 1996)).

Since an evaluation of Armstrong's claim that the tapes were so garbled as to be impossible for the jury to come to an independent conclusion as to their contents requires review of the tapes themselves, Armstrong's failure to ensure their presence in the certified record is fatal to his claim. We therefore conclude that Armstrong's second issue on appeal merits no relief.

In his third issue on appeal, Armstrong argues that the convictions for Possession With Intent to Deliver must be reversed as the verdict slip contained references to the weight of the narcotics alleged to be involved. In support, he cites to ***Commonwealth v. Serrano***, 61 A.3d 279 (Pa. Super. 2013), for the proposition that a defendant is entitled to notice, *via* Criminal Information, of any element of a crime on the verdict slip.

In ***Serrano***, the defendant was charged with delivery of heroin in the Criminal Information against him. ***See id***., 61 A.3d at 286-287. The evidence at trial against Serrano pertained to his involvement with a heroin distribution ring. However, the verdict slip given to the jury asked the jury to come to a verdict regarding Serrano's involvement with distributing cocaine. ***See id***., at 287. On appeal, a panel of this Court held that the judgment of sentence for delivery of cocaine must be vacated, as Serrano

had never been charged with the delivery of cocaine, nor had any evidence of delivering cocaine been presented to the jury. *See id*.

Here, the weight of the cocaine involved was not an element of the crime, and the trial court did not instruct the jury to the contrary. *See* N.T., 3/25/13, at 19-24. Rather, the weight of the cocaine was, at the time, an issue regarding the imposition of a mandatory minimum sentence, which was not within the province of the jury.[1] We therefore conclude that Armstrong's third issue on appeal merits no relief.

In his final issue on appeal, Armstrong contends that his judgment of sentence is illegal pursuant to *Alleyne v. United States*, ___ U.S. ___, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013). The trial court imposed a mandatory minimum sentence pursuant to 18 Pa.C.S.A. 7508(a)(3). *Alleyne* was published after sentence was imposed in this case, but applies nevertheless. *See Commonwealth v. Watley*, 81 A.3d 108, 118 (Pa. Super. 2013) (*en banc*) (holding that violations of *Alleyne* could not be waived). Furthermore, this Court has since held that, pursuant to *Alleyne*, section 7508 is facially unconstitutional. *See Commonwealth v. Fennell*, ___ A.3d ___, 2014 WL 6505791 (Pa. Super., filed November 21, 2014). Both

---

[1] Furthermore, the jury's verdict cannot cure the *Alleyne* issue discussed below. *See Commonwealth v. Fennell*, ___ A.3d ___, ___, 2014 WL 6505791 (Pa. Super., filed November 21, 2014) (rejecting the argument that the requirements of *Alleyne* could be satisfied by a jury finding that the factual predicate for imposition of the mandatory minimum had been established).

the Commonwealth, *see* Appellee's Brief, at 41, and the trial court, *see* Trial Court Opinion, 12/18/13 at 36-37, concede that a remand for resentencing is appropriate in this matter.

The only objection to such a procedure comes from Armstrong, who vaguely alleges that a remand for resentencing "would impinge his constitutional rights, and suggests that instead, judgment be arrested and the charges dismissed." Appellant's Brief, at 21. Armstrong provides no citation to authority supporting his request for dismissal, and we can find none. Rather, as the trial court notes, the proper procedure is a remand for resentencing. *See Commonwealth v. Goldhammer*, 517 A.2d 1280, 1283-1284 (Pa. 1986). We therefore vacate the judgment of sentence in its entirety and remand for resentencing.

Convictions affirmed. Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

Judge Platt joins in the memorandum.

Judge Olson concurs in the result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/23/2014</u>

# IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA, CRIMINAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | NO. 6618-11 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| TYRONE ARMSTRONG | : | |

Kelly Sekula, Esquire, Attorney for Commonwealth of Pennsylvania

Joseph Del Sordo, Esquire, Attorney for Tyrone Armstrong

JENKINS, J.                                                    FILED: 12/18/13

## OPINION

A jury found Tyrone Armstrong guilty of racketeering, possession with intent to deliver a controlled substance ("PWID") and other charges arising from a multi-county drug enterprise. On May 6, 2013, the Court sentenced Armstrong to an aggregate term of 9-18 years imprisonment. The primary component of this sentence was a mandatory minimum sentence of 7-14 years imprisonment for PWID.

On May 16, 2013, Armstrong filed timely post-sentence motions, which the Court denied in an order docketed on June 22, 2013. On June 18, 2013, Armstrong filed a timely direct appeal from the order denying post-sentence motions. On July 9, 2013, he filed a timely concise statement of matters complained of on appeal ("concise statement"). Armstrong has raised well over twenty issues in this direct appeal, most of them pertaining to his challenge to the sufficiency of the evidence. None of the arguments raised in Armstrong's concise statement have merit except for his objection to his mandatory minimum sentence for PWID. For the reasons articulated below,

RECORD RECORD FILED IN SUPERIOR SUPERIOR COURT

DEC 24 DEC 24 2013

PHILADELPHIA PHILADELPHIA

1

Armstrong's judgment of sentence should be vacated and the case remanded for resentencing on all verdicts of guilt.

## I.     FACTUAL AND PROCEDURAL HISTORY

This case involves a conspiracy to sell large quantities of crack cocaine in Philadelphia, Darby (Delaware County) and Coatesville (Chester County). Lester Womack, the leader of the conspiracy, stored substantial amounts of money and crack in a house he shared with his mother in Darby, Delaware County. N.T., 3/22/13, pp. 47-52. Lester Womack manufactured and bagged the crack in Marcus Womack's residence in Philadelphia. N.T., 3/20/13, p. 158. Armstrong, whom Lester Womack[1] described as his "right hand man," assisted Womack in counting money and in meeting Womack's main supplier, Clifford Hopkins. N.T., 3/20/13, p. 150.

The Commonwealth's principal witness was Agent Michael Kelly, the lead investigator from the Attorney General's Office, who testified as an expert in the areas of narcotics, narcotics investigations, coded language and drug jargon. N.T., 3/19/13, pp. 95-97, 188-89. In June 2011, Agent Kelly began an investigation into Lester Womack's crack distribution ring. N.T., 3/19/13, pp. 95-97. Agent Kelly was not aware of Womack having any type of employment or income source other than drug sales. N.T., 3/20/13, p. 150. Between June and September 2011, confidential informants made multiple controlled purchases of crack from houses in Coatesville reportedly operated by Womack, N.T., 3/20/13, pp. 23-31, 41-46. Armstrong was not present during the controlled purchases. N.T., 3/20/13, p. 48. Agent Kelly obtained a warrant to place a trap and trace pen register device on phone numbers registered to Womack and Ronald Vann, Jr. N.T., 3/19/13, pp. 97-99. Based on the high volume of calls to Womack's

---

[1] Unless otherwise specified, references to "Womack" in this opinion are to Lester Womack.

phone, Agent Kelly obtained a warrant for a nonconsensual wiretap on these phones. N.T., 3/19/13, pp. 100, 103.

The investigation into the drug ring, Operation Breadwinner, took place mainly during the latter half of September 2011. During that time period, detectives recorded conversations between Womack and Ronald Vann relating to drug sales in Coatesville, Chester County. N.T., 3/20/13, pp. 58, 68-69. These calls took place daily. N.T., 3/20/13, p. 58. Womack also spoke with Clifford Hopkins discussing (a) shipments of cocaine between them (they sold drugs to one another), (b) Hopkins cooking crack from cocaine that Womack had received from another Delaware County supplier, Ackalith Kontanone, and (c) the amount of cocaine Hopkins was storing at Womack's mother's house in Darby, Delaware County. N.T., 3/20/13, pp. 7, 59, 61, 74-75, 81-86, 98, 99-100, 155-59, 197. Other drug-related phone calls took place between Womack and Kontanone. N.T., 3/20/13, pp. 71-73, 76-78, 86-87.

On September 16, 2011, Armstrong and Womack were recorded discussing a sale of 2 ¼ ounces of cocaine. N.T., 3/20/13, pp. 62-63, 65. Agent Kelly recognized Armstrong's voice on this call because he spoke with Armstrong after his arrest. N.T., 3/20/13, pp. 64-65, 91-92, 97-98. Womack said that he wanted the cocaine "raw" (powdered), but Armstrong said that the cocaine had already been "done up" (cooked into crack). N.T., 3/20/13, pp. 65-66. Womack admonished Armstrong for not calling Womack earlier to discuss this transaction, because Womack could have "kicked" (increased) the 2¼ ounces to 3½ ounces by adding a cutting agent to increase the sale profit. N.T., 3/20/13, pp. 66-67.

3

On September 18, 2011, Officer Peter Sarris observed a meeting in Darby, Delaware County between Hopkins in his Cadillac and the operator of a white Range Rover. N.T., 3/20/13, pp. 110-12. On September 20, 2011, Officer Shawn McLaughlin observed a meeting a meeting in Darby between Womack and Kontanone, who was driving a white Range Rover with license plate HKF1004. N.T., 3/20/13, pp. 119-20. Officer McLaughlin followed Kontanone's Range Rover to the Grant Terrace Apartments at 601 Grant Avenue, where it was parked in front of Unit 43. N.T., 3/20/13, p. 120. On September 21, 2011, the detectives learned that Kontanone was supposed to deliver 2 ¼ ounces of cocaine to Womack's residence. N.T., 3/20/13, p. 102. Officers obtained a search warrant for Kontanone's residence at the Grant Terrace Apartments and his Range Rover, and in the ensuing raid, they seized almost 100 grams of cocaine, contraband and $17,000 in cash. N.T., 3/20/13, pp. 101-03, 127-35.

On September 22, 2011, officers recorded two telephone calls from Womack to Armstrong in which Womack counted money from sales of crack and asked for Armstrong's help. N.T., 3/20/13, pp. 149-50. As Womack hung up, he told someone in the background that Armstrong was his "right-hand man". N.T., 3/20/13, p. 150. On September 22-23, 2011, officers recorded a series of phone calls between Lester Womack and Marcus Womack plus one phone call from Lester Womack to Armstrong. N.T., 3/20/13, pp. 150-54. The conversation between Lester Womack and Armstrong concerned Hatfield Street, the street on which Marcus Womack lived. N.T., 3/20/13, p. 154. Lester Womack used Marcus Womack's house for cooking and bagging crack cocaine. N.T., 3/20/13, pp. 154, 185-86.

On September 26, 2011, Armstrong called Lester Womack and said: "Yeah, that shit should be in our account, direct deposit, within 48 hours." N.T., 3/20/13, pp. 202, 228.

On September 27, 2011, Womack called Armstrong and asked where he, Womack, could obtain empty bags to package crack cocaine. N.T., 3/20/13, pp. 207-08. Armstrong answered that bags were available in poppy stores, Spanish-owned corner stores in the city. N.T., 3/20/13, pp. 208, 227. Womack was hesitant about going to poppy stores because he thought he could get robbed or shot. N.T., 3/20/13, p. 208. One minute later, Armstrong telephoned Womack and asked how many "jawns" (ounces) of cocaine Womack had. N.T., 3/20/13, p. 208-09; N.T., 3/21/13, p. 61. Womack said that he had two, and Armstrong asked to purchase one ounce for $1,000, which was a normal street price for an ounce of crack. N.T., 3/20/13, p. 209; N.T., 3/21/13, p. 61. Womack did not want to make this sale because he believed his supplier would not be out until tomorrow and he (Womack) would burn through two ounces of cocaine tonight. N.T., 3/20/13, p. 209; N.T., 3/21/13, pp. 61-62. Womack indicated that he would "go around there and see if he's home," and "go see his guy now who lives in the neighborhood" i.e., Womack would go see if his supplier was around so that he could obtain an ounce of cocaine for Armstrong. N.T., 3/21/13, pp. 62, 69. One minute after concluding this conversation, Womack called Clifford Hopkins. N.T., 3/20/13, pp. 209-10.

Ten minutes later, Armstrong called Womack and asked whether Womack heard back from his supplier. N.T., 3/20/13, pp. 211-12. Womack answered "he's down there no[w]; that it shouldn't be too long." N.T., 3/20/13, p. 212. Agent Kelly recounted the conversation as follows: "Armstrong asked if Womack heard from him, meaning Clifford

5

Hopkins. Womack replies no, I'm down here now. It's not going to take long. And then Armstrong asks, oh, you're getting it? And Womack replies, yeah, I'm out here now." N.T., 3/21/13, p. 69. Agent Kelly testified that this conversation was in reference to the conversation between Womack and Armstrong ten minutes earlier in which Armstrong inquired about purchasing one ounce of cocaine. N.T., 3/20/13, p. 212. Later that evening, Officer Sarris observed Womack meet another male outside the Blue Nile Bar at 52nd and Webster Streets in Philadelphia, Clifford Hopkins' center of operations. N.T., 3/21/13, pp. 7-8, 92. Based on this evidence, Agent Kelly opined that on September 27, 2011, Womack obtained one ounce of cocaine from Hopkins, and Armstrong obtained this ounce from Womack for redistribution. N.T., 3/21/13, pp. 68-69, 91. Police officers never found this ounce on Armstrong or anyone else. N.T., 3/21/13, pp. 91-92.

On September 28, 2011, Womack called Armstrong and asked whether Armstrong wanted to open a crack house for Womack in the area of 54th and Gregg Avenues in Philadelphia. N.T., 3/20/13, p. 243. Later that day, Officer Sarris observed Armstrong meet Womack on the 6500 block of Upland Street in Philadelphia and drive away in Armstrong's automobile. N.T., 3/21/13, pp. 9-10. The men drove to the Blue Nile bar at 52nd and Webster and entered the bar. N.T., 3/20/13, pp. 88-90; N.T., 3/21/13, p. 11. When they left the bar, Armstrong placed a white bag or white object in the trunk of his car. N.T., 3/21/13, pp. 11, 15, 34-35. The males drove back to the 6500 block of Upland Street, where Armstrong dropped Womack off. N.T., 3/21/13, p. 17.

On September 29, 2011, Officer Sarris observed Womack's car parked on the 6500 block of Upland Street and Armstrong's car parked on 65th Street. N.T., 3/21/13, p. 19. Womack was standing at the open passenger door of Armstrong's car, and

6

Armstrong was standing at the open driver door. N.T., 3/21/13, p. 19. Officer Sarris drove around the block. When he returned, both Womack's and Armstrong's cars were gone when he returned. N.T., 3/21/13, pp. 21-22. Agent Freddie Chaves observed Womack and Armstrong drive up to 5657 Hatfield Avenue in Womack's car, enter the building and leave five minutes later with Marcus Womack. N.T., 3/21/13, pp. 116-17.

On the evening of September 29th, Womack complained to Hopkins that he had lost "28" (28 grams, or one ounce). N.T., 3/21/13, pp. 48-49. Agent Kelly explained that Hopkins had supplied cocaine powder to Womack, but that 28 grams was lost when the powder was cooked into crack. N.T., 3/21/13, pp. 48-49. Hopkins replied that he had talked to his supplier, and that he would "throw a half a hard on it next time", i.e., in the next delivery, he would make up for the loss of 28 grams of powder by adding 14 grams of crack. N.T., 3/21/13, pp. 48-49. Womack did not find the arithmetic fair: he complained that he should not receive just 14 grams of crack after losing 28 grams of powder. N.T., 3/21/13, pp. 48-49, 83. Hopkins replied: "That's why you should have done the 4½, 4½", i.e., that is why Womack should have purchased nine ounces. N.T., 3/21/13, p. 49. Womack again disagreed, stating "if I do that, I'm going to lose a 56", i.e., if he purchased nine ounces of powder, he would have lost 56 grams (two ounces) in the cooking process. N.T., 3/21/13, p. 49. Based on this conversation, Agent Kelly concluded that Womack had purchased 4½ ounces of cocaine powder from Hopkins, N.T., 3/21/13, p. 50, but was upset about losing one ounce of powder during the cooking process.

The following day, September 30, 2011, Womack called Armstrong, and Armstrong asked whether Womack had talked with Old Head, the supplier who had sold

Womack the cocaine powder. N.T., 3/21/13, pp. 50-51. Womack replied that he would give Armstrong "14 and a better play", i.e., to make up for the loss of the 28 grams of powder, the supplier would reduce the price of the next sale and throw in 14 grams of crack. N.T., 3/21/13, p. 52. Armstrong complained that "it was 28", i.e., he had lost 28 grams while cooking the cocaine powder. N.T., 3/21/13, p. 52. Womack repeated that the supplier would make it up by giving Armstrong "a better play and the 14, you hear me?" i.e., the lower price and the 14 grams of crack would make up for the loss of the 28 grams of powder. N.T., 3/21/13, p. 52.

One half hour later, Armstrong called Womack, and Womack said "this shit is snappin right now, yo, snappin," i.e., his crack was selling fast. N.T., 3/21/13, p. 53. Womack asked Armstrong "how much of that shit you got left," and Armstrong answered that he had sold one half ounce and had 2 ½ ounces left. N.T., 3/21/13, pp. 53-54, 70-71. Womack stated that he might have a customer for the 2 ½ ounces. N.T., 3/21/13, p. 54. Later that morning, Womack called Armstrong and said that he sold "eight" ($8,000) the night before because the crack was so good. N.T., 3/21/13, pp. 54-55. Womack offered to buy Armstrong's 2 ½ ounces for $2,500; Armstrong made a counteroffer of $3,000. N.T., 3/21/13, p. 55. Armstrong and Womack continued to negotiate throughout the day in five more telephone calls. N.T., 3/21/13, pp. 56-62. Much of these conversations concerned whether Womack could contact his supplier, Old Head, to obtain more cocaine to cook into crack. N.T., 3/21/13, pp. 56-62. Finally, Armstrong said he would sell the cocaine for $2,500, Womack's original offer. N.T., 3/21/13, p. 57. Armstrong then said "I already made $500," which meant that he already made $500 by selling a half ounce of cocaine. N.T., 3/21/13, p. 57.

8

Based on the conversations between Armstrong and Womack from September 28th through September 30th, conversations between Womack and Hopkins on September 29th and 30th, and surveillance of Armstrong at the Blue Nile Bar in Philadelphia, Agent Kelly opined that Armstrong obtained four ounces of cocaine on September 28, 2011, when he walked out of a Philadelphia bar with a white bag. He then cooked the cocaine into crack, losing an ounce in the cooking process, and sold it. N.T., 3/21/13, pp. 70, 91-101; N.T., 3/22/13, p. 14. Police officers never recovered any of the four ounces from Armstrong. N.T., 3/21/13, pp. 97-98. Agent Kelly further opined that Armstrong was in possession of 2½ ounces of cocaine on September 30, 2011, based on Armstrong's statement to Womack that he sold half an ounce of the three ounces in his possession. N.T., 3/22/13, p. 25.

On October 1, 2011, Armstrong and Womack spoke twice on the telephone about a drug sale to a buyer who bet on college football games and who would not be available until after the games concluded. N.T., 3/21/13, pp. 74-76. Armstrong told Womack that he would call someone to obtain a supply of cocaine. N.T., 3/21/13, p. 76.

On October 2, 2011, Womack told Armstrong on the telephone that somebody wanted to purchase 2 ¼ ounces of crack. N.T., 3/21/13, p. 151-52. They also talked about not putting in enough baking soda while cooking crack, which is why there was not enough made. N.T., 3/21/13, p. 152. They discussed the idea of buying a quarter pound of cocaine for $3,250, turning it into crack and selling it for $4,500. N.T., 3/21/13, p. 152. Armstrong was ambivalent about this idea because he did not want to have that much cocaine in his possession in case he got caught by the police. N.T., 3/21/13, p. 153.

9

Police intercepted over 4,000 calls on Womack's phone and over 5,000 on Vann's phone over a 2 ½ week period. N.T., 3/22/13, p. 10. Police arrested 19 or 20 people as a result of this investigation, many of whom had drugs or drug-related items in their possession at the time of arrest. N.T., 3/22/13, p. 11. Police recovered substantial amounts of crack cocaine, money and contraband from Womack's mother's residence in Darby, Pennsylvania and from Womack's residence in Philadelphia. N.T., 3/22/13, pp. 46-57.

Count 9 of the amended bills of information[2] accused Armstrong of possessing 4.5 ounces of cocaine with intent to deliver on September 28-30, 2011. During jury instructions, the Court defined PWID's elements of possession and intent to deliver. N.T., 3/25/13, pp. 19-24, 42-45. The Court did not instruct, however, that the amount of 4.5 ounces is an element of PWID, or that the jury was required to find this amount beyond a reasonable doubt. N.T., 3/25/13, pp. 19-24, 42-45.

The jury found Armstrong guilty of corrupt organizations (Count 1), conspiracy to corrupt organizations (Count 2), dealing in proceeds of unlawful activity (Count 3), conspiracy to deal in proceeds of unlawful activity (Count 5), conspiracy to possess with intent to deliver a controlled substance (Count 6), criminal use of a communications facility (Count 7), and possession with intent to deliver a controlled substance (4.5 ounces) between September 27-30, 2011 (Count 9). N.T., 3/25/13, pp. 59-61; *see also* Verdict Slips. The jury acquitted Armstrong of possession with intent to deliver a controlled substance (one ounce) on September 27, 2011 (Count 8). N.T., 3/25/13, p. 60.

---

[2]The Commonwealth amended the bills of information before jury selection by withdrawing several charges against Armstrong. N.T., 3/19/13, pp. 4-12.

## II.    ARMSTRONG'S    CHALLENGES    TO    SUBJECT    MATTER JURISDICTION

Armstrong argues that there was "insufficient evidence to establish that he committed any crime in Delaware County or even in Pennsylvania." Concise Statement, ¶ 1(a). Although couched in terms of sufficiency of the evidence, this actually is an objection to this Court's subject matter jurisdiction.

This Court has subject matter jurisdiction over every charge on which the jury convicted Armstrong. 18 Pa.C.S. § 102, entitled "Territorial Applicability", provides in relevant part:

> [A] person may be convicted under the law of this Commonwealth of an offense committed by his own conduct or the conduct of another for which he is legally accountable if either:
>
> (1) the conduct which is an element of the offense or the result which is such an element occurs within this Commonwealth. . .[or]
>
> (3) conduct occurring outside this Commonwealth is sufficient under the law of this Commonwealth to constitute a conspiracy to commit an offense within this Commonwealth and an overt act in furtherance of such conspiracy occurs within this Commonwealth. . .

Subject matter jurisdiction relates to the competency of a court to hear and decide the type of controversy presented. *Commonwealth v. Bethea,* 574 Pa. 100, 828 A.2d 1066, 1074 (2003) (*citing McGinley v. Scott,* 401 Pa. 310, 164 A.2d 424 (1960)). Jurisdiction is a matter of substantive law. *Id.,* 828 A.2d at 1074; *see also* 42 Pa.C.S. § 931(a) (defining unlimited original jurisdiction of courts of common pleas). "[A]ll courts of common pleas have statewide subject matter jurisdiction in cases arising under the Crimes Code." *Id.,* 828 A.2d at 1074. Although each court of common pleas possesses the same subject matter jurisdiction to resolve cases arising under the Crimes Code, "that jurisdiction

11

should only be exercised beyond the territorial boundaries of the judicial district in which it sits in the most limited of circumstances."[3] *Id.* at 1075.

The Court will review each charge against Armstrong under these standards. **PWID** requires the Commonwealth to prove beyond a reasonable doubt that the defendant "both possessed the controlled substance and had an intent to deliver that substance." *Commonwealth v. Kirkland,* 831 A.2d 607, 611 (Pa. Super. 2003). To prove **conspiracy to possess controlled substances with intent to deliver,** the Commonwealth must prove that the defendant: 1) entered into an agreement to commit or aid in PWID with another person or persons; 2) with a shared criminal intent; and 3) an overt act was done in furtherance of the conspiracy. *Commonwealth v. Watley,* -- A.3d --, 2013 WL 6164340, *6 (*citing Commonwealth v. Devine,* 26 A.3d 1139, 1147 (Pa. Super. 2011)). "The conduct of the parties and the circumstances surrounding such conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt." *Id.* The conspiratorial agreement "can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." *Id.*

In this case, police officers observed Armstrong attended meetings in Philadelphia on September 27 and 28, 2011. The meeting on September 28th was with Womack inside a bar, and following this meeting, Armstrong was holding a white bag outside the bar. This evidence, viewed in conjunction with Armstrong's phone calls with Womack, show that the bag contained cocaine. On September 30, 2011, Armstrong agreed to sell

---

[3] Armstrong also raises objections to venue, which is separate and distinct from subject matter jurisdiction. The venue issues are discussed *infra* at pp. 16-18.

cocaine to Womack for $2,500 and then stated that he already made $500 from selling a half ounce of cocaine. The evidence further shows numerous transactions between Womack and Clifford Hopkins (Womack's supplier), Ronald Vann and Marcus Womack. The Commonwealth thus satisfied 18 Pa.C.S. § 102(1) by proving the charges of PWID and conspiracy to commit PWID against Armstrong with evidence of conduct "within this Commonwealth."

**Dealing in proceeds of unlawful activities** is defined in relevant part as follows:

A person commits a felony of the first degree if the person conducts a financial transaction under any of the following circumstances:

(1) With knowledge that the property involved, including stolen or illegally obtained property, represents the proceeds of unlawful activity, the person acts with the intent to promote the carrying on of the unlawful activity.

18 Pa.C.S. § 5111(a). A "financial transaction" is "a transaction involving the movement of funds by wire or other means or involving one or more monetary instruments. The term includes any exchange of stolen or illegally obtained property for financial compensation or personal gain." 18 Pa.C.S. § 5111(f). A "transaction" includes "a purchase, sale, loan, pledge, gift, transfer, delivery or other disposition." *Id.* "Conducts" includes "initiating, concluding or participating in initiating or concluding a transaction." *Id.* A "monetary instrument" includes, among other items, "coin or currency of the United States." *Id.* "Unlawful activity" is "any activity graded a misdemeanor of the first degree or higher under Federal or State law." *Id.*

In this case, over a two week period in September and October of 2011, police officers recorded numerous conversations between Armstrong and Womack discussing the amount to charge third persons for sales of cocaine. They also negotiated what Armstrong would charge for selling cocaine to Womack. During one conversation on

13

September 30th, Armstrong admitted selling half an ounce of cocaine for $500. Many conversations took place after police observed Armstrong in Philadelphia carrying a bag of cocaine in Womack's presence. Womack stored drugs and money from drug sales in his house in Darby, Pennsylvania, asked Armstrong to help him count money from drug sales, and referred to Armstrong as his "right-hand man." These transactions demonstrate that Armstrong "act[ed] with the intent to promote the carrying on of the unlawful activity" *in Pennsylvania.* 18 Pa.C.S. § 5111(a)(1). This holds true even if Armstrong was outside of Pennsylvania during every telephone call with Womack, because "acts done outside [Pennsylvania], but intended to produce and producing detrimental effects within it, justify [Pennsylvania] in punishing the cause of the harm." *Commonwealth v. Giusto*, 810 A.2d 123, 126 (Pa. Super. 2003) (*citing Commonwealth v. Bighum*, 452 Pa. 554, 307 A.2d 255, 258 (1973)).

**Conspiracy to deal in proceeds of unlawful activities** occurs when the defendant 1) enters into an agreement to commit or aid in dealing such proceeds with another person or persons; 2) with a shared criminal intent; and 3) an overt act is done in furtherance of the conspiracy. *Watley, supra*, 2013 WL 6164340, at *6. The meetings that Armstrong attended in Philadelphia, Womack's storage of money in Darby, and Womack's sales of drugs in Chester County all satisfy 18 Pa.C.S. § 102(3)'s requisite of an overt act within Pennsylvania in furtherance of a conspiracy to deal in unlawful proceeds.

**Criminal use of a communication facility** takes place when the defendant "uses a communication facility to commit, cause or facilitate the commission or the attempt thereof of any crime which constitutes a felony under [the Crimes Code or the Controlled

14

Substance, Drug, Device and Cosmetic Act.]" 18 Pa.C.S. § 7512(a). The many phone calls between Armstrong and Womack violated § 7512(a) because they promoted a drug trafficking conspiracy. Jurisdiction exists in Pennsylvania because the purpose of these acts was to cause harm inside of Pennsylvania through drug sales. *Giusto*, *supra*.

The offense of **corrupt organizations** provides in relevant part: "It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 Pa.C.S. § 911(b)(3). "Enterprise" means "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and governmental entities." 18 Pa.C.S. § 911(h)(3). "Racketeering activity" includes PWID, dealing in proceeds of criminal activities, and conspiracy to commit these offenses. 18 Pa.C.S. § 911(h)(ii), (iii). "Pattern of racketeering activity" refers to a "course of conduct requiring two or more acts of racketeering activity, one of which occurred after the effective date of this section."[4] 18 Pa.C.S. § 911(h)(4).

The discussion above demonstrates that Armstrong was a member of an enterprise devoted to drug dealing, and that Armstrong participated in the enterprise's affairs through a pattern of PWID, dealing in proceeds of criminal activities, and conspiracy to commit PWID and dealing in unlawful proceeds in Pennsylvania. Jurisdiction clearly exists to prosecute this corrupt organizations offense in Pennsylvania.

**Conspiracy to commit corrupt organizations** takes place when the defendant enters into an agreement to engage in corrupt organizations with another person or

---

[4] Section 911 was last amended in 2006.

persons; 2) with a shared criminal intent; and 3) an overt act is done in furtherance of the conspiracy. *Watley, supra.* The discussion above shows that Armstrong engaged in a conspiracy to commit a pattern of acts in this Commonwealth that constitute corrupt organizations.

## III.    ARMSTRONG'S CHALLENGES TO VENUE IN DELAWARE COUNTY

Armstrong contends that there was insufficient evidence to establish that he was part of the criminal activity under investigation that others perpetrated, so he should have been "charged and tried in the jurisdiction where the Commonwealth [could] establish that he committed a crime, not where others might have done so." Concise Statement, ¶ 1(b). He also states that "jurisdiction" in Delaware County "was not established for any of the crimes for which [he] was convicted or were alleged to have been committed by anyone." Concise Statement, ¶ 2. Finally, he states that the affidavit proffered by the Commonwealth to gain "jurisdiction" in Delaware County lacked specificity, was based on speculation, and contained errors of fact. Concise Statement, ¶ 3.

Although Armstrong's phrasing is opaque, he appears to state that Delaware County was an improper venue for his trial because there is no evidence that he himself committed a crime in this county. The Court disagrees.

At the outset, paragraph 3 of Armstrong's concise statement is waived due to vagueness. When the Court directs an appellant to file a concise statement of matters complained of on appeal under Pa.R.A.P. 1925, any issues that are not raised in such a statement will be waived for appellate review. *Commonwealth v. Dowling,* 778 A.2d 683, 686 (Pa.Super.2001), (*citing Commonwealth v. Lord,* 553 Pa. 415, 719 A.2d 306, 308 (1998)). Similarly, when issues are too vague for the trial court to identify and address,

16

that is the functional equivalent of no concise statement at all. *Id.* Rule 1925 is intended to aid trial judges in identifying and focusing upon those issues which the parties plan to raise on appeal. *Commonwealth v. Lemon,* 804 A.2d 34, 37 (Pa.Super.2002). "When the trial court has to guess what issues an appellant is appealing, that is not enough for meaningful review." *Id. (citing Dowling, supra).* Paragraph 3 of Armstrong's concise statement, which assails the affidavit proffered by the Commonwealth to obtain "jurisdiction" in Delaware County, fails to explain *why* the affidavit is "based on speculation" or *what* "errors of fact" it contains. As a result, the Court must guess at what Armstrong is appealing. This "is not enough for meaningful review." *Id.*

Turning to the other arguments, the Court has no doubt that venue was proper in Delaware County. Venue and subject matter jurisdiction are distinct concepts. *Bethea, supra,* 828 A.2d at 1074. Venue relates to the right of a party to have the controversy brought and heard in a particular judicial district. *Id.* at 1074-75 *(citing McGinley,* 164 A.2d at 427-28). Venue is predominately a procedural matter and assumes the existence of jurisdiction, but these terms "are often used interchangeably because they must exist simultaneously in order for a court to properly exercise its power to resolve a particular controversy." *Id.*

Rules of venue

recognize the propriety of imposing geographic limitations on the exercise of jurisdiction. Venue in a criminal action properly belongs in the place where the crime occurred. *Commonwealth v. Mulholland,* 549 Pa. 634, 702 A.2d 1027 (1997). This practice recognizes the necessity of bringing a party to answer for his actions in the place where the crime itself occurred because that is where the evidence and the witnesses will most likely be located. It would be nonsensical to transport defendants, evidence and witnesses from Philadelphia to Erie to resolve criminal charges arising in the former location before a judge and/or jury sitting in the latter location.

> Generally, venue begins in the court with a geographic connection to the events at issue.

*Id.*, 828 A.2d at 1075.

More specific venue principles govern prosecutions for criminal conspiracy. The Commonwealth may bring such prosecutions in any county where the unlawful combination is formed, or in any county where an overt act is committed by any of the conspirators in furtherance of the unlawful combination. *Commonwealth v. Fithian*, 599 Pa. 180, 961 A.2d 66, 78 (2008) (*citing Commonwealth v. Thomas,* 410 Pa. 160, 164, 189 A.2d 255, 258 (1963)). The many phone calls between Armstrong and Lester Womack, and the surveillance evidence of the two men together while Armstrong was holding a white bag, demonstrate that these men formed a conspiracy to commit PWID and corrupt organizations.[5] Moreover, Womack committed an overt act in Delaware County in furtherance of the conspiracy by storing drugs and money in a house in Darby. Therefore, it was permissible to try Armstrong in Delaware County on the conspiracy charges. *Fithian, supra.* And as a consequence of bringing a conspiracy prosecution in Delaware County, it became necessary to try him in the same case on all other substantive charges arising from the same facts as the conspiracy charges (i.e., corrupt organizations, PWID, dealing in proceeds of unlawful activity, criminal use of communication facilities), because a separate trial on the substantive charges would have violated Armstrong's double jeopardy rights and the rule of compulsory joinder embodied in 18 Pa.C.S. § 110[6].

---

[5] The evidence certainly demonstrated that other men took part in the conspiracy, but for purposes of this issue, it only is necessary to focus on Armstrong and Womack.

[6] It was not necessary, however, to join Lester Womack as a defendant in this case. Pennsylvania does not require all conspirators to be joined as defendants in one trial. *Commonwealth v. Fremd,* 860 A.2d 515,

18

## IV.  ARMSTRONG'S CHALLENGES TO THE SUFFICIENCY OF THE EVIDENCE

Armstrong raises a multitude of challenges to the sufficiency of the evidence. The standard in reviewing the sufficiency of the evidence is

> whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Knox*, 50 A.3d 749, 754 (Pa. Super. 2012).

**First**, Armstrong argues that the evidence was insufficient to convict him of PWID, because the evidence did not show that he possessed any cocaine or delivered cocaine to anyone, or that Womack had any cocaine to give to Armstrong. Concise Statement, ¶ 1(c).

Circumstantial evidence alone can prove possession of narcotics. *Commonwealth v. Carpio-Santiago*, 14 A.3d 903, 907 (Pa. Super. 2011). For example, in *Commonwealth v. Leskovic*, 227 Pa. Super. 565, 307 A.2d 357 (1973), several witnesses testified that the defendants sold them drug capsules, and one witness described the physical appearance of the capsules. A pharmacist testified that the drug in question came in capsules that met the physical description the witness provided. A urine test conducted on a witness,

---

521 (Pa. Super. 2004) (defendant could be convicted of conspiracy, even though he was the only person charged with the conspiracy and none of the alleged co-conspirators were charged).

who testified to having purchased the drug from the defendants, revealed traces of the drug in question. The Superior Court held that even without chemical analysis of the actual capsules, the totality of the evidence was enough to sustain a conviction for dispensing dangerous drugs. *Id.,* 307 A.2d at 358.

Similarly, in this case, the Commonwealth produced sufficient circumstantial evidence to demonstrate beyond a reasonable doubt that Armstrong was guilty of PWID. Over a two week period in September and October of 2011, police officers recorded numerous conversations between Armstrong and Womack discussing the amount to charge third persons for sales of cocaine. They also negotiated what Armstrong would charge for selling cocaine to Womack. Police also observed Armstrong in Philadelphia carrying a white bag in Womack's presence following a meeting in a bar. Womack stored drugs and money from drug sales in his Philadelphia residence and his mother's house in Darby, Pennsylvania, asked Armstrong to help him count money from drug sales, and referred to Armstrong as his "right-hand man." Armstrong agreed to sell cocaine to Womack for $2,500 and also stated that he had made $500 for selling a half ounce. Viewed in the light most favorable to the Commonwealth, this evidence establishes that Armstrong was guilty of PWID.

**Second**, Armstrong asserts that there was insufficient evidence that he actually possessed cocaine due to lack of laboratory analysis or other type of identification (or that it weighed 4.5 ounces). Concise Statement, ¶ 1(d).

The Commonwealth did not present any evidence that controlled substances were found in Armstrong's residence or on his person. Nor did the Commonwealth present any laboratory analysis of the cocaine that Armstrong sold. Nevertheless, as discussed

20

above in the analysis of subject matter jurisdiction on pages 12-17, the Commonwealth produced sufficient circumstantial evidence which, viewed in the light most favorable to the Commonwealth, establishes that he was in possession of cocaine. This conclusion hardly seems startling: the Commonwealth can utilize circumstantial evidence to prove murder without finding the victim's body,[7] so it certainly can prove PWID without producing or testing the alleged controlled substance.

**Third**, Armstrong claims that the Commonwealth failed to establish the *corpus delicti* of PWID prior to introducing Armstrong's statements. Concise Statement, ¶ 1(e).

The *corpus delicti* rule guards against "the hasty and unguarded character which is often attached to confessions and admissions and the consequent danger of a conviction where no crime has in fact been committed." *Commonwealth v. Friend*, 717 A.2d 568, 569-70 (Pa. Super. 1998). Admission of such statements requires proof by a preponderance of the evidence that a crime has been committed. *Id.* (*citing Commonwealth v. Reyes*, 545 Pa. 374, 681 A.2d 724, 727 (1996). The *corpus delicti* may be established by circumstantial evidence. *Id.*

Importantly, the *corpus delicti* rule does not require the Commonwealth to present evidence in any particular order. In *Friend*, the defendant argued that the trial court erred by admitting his admission before other evidence of crime. The Superior Court responded:

> The *corpus delicti* rule is not one of constitutional dimension, dealing with the quantity of evidence known at the time of the statement, nor is it a question of

---

[7]*See Commonwealth v. Burns*, 409 Pa. 619, 187 A.2d 552, 554-55 (1963) (circumstantial evidence, including a complete interruption and cessation in the activities and contacts with other individuals of vigorous 49-year-old woman who was last seen by a friend lying motionless on the floor with blood on her head in the house in which she had been living with a man not her husband, sufficiently established corpus delicti in prosecution for first degree murder of the woman although neither the woman's body nor any part thereof was ever found).

21

custody or investigative permissibility. The rule is one of trial evidence. It is not designed to circumscribe the gathering of evidence. Its applicability turns on the quantity of evidence, not the order of its gathering. . .That appellant's admissions were introduced before the *corpus delicti* was completely satisfied is immaterial, as the Commonwealth ultimately fulfilled that burden.

*Id.*, 717 A.2d at 572.

The same reasoning applies here. Regardless of the order in which the Commonwealth presented its evidence, it ultimately satisfied the *corpus delicti* with circumstantial evidence of Armstrong's possession of cocaine and his conspiracy with Womack to sell crack.

**Fourth**, Armstrong challenges the wording of the verdict slip. Count 9 of the verdict slip stated "possession with intent to deliver...4.5 ounces." N.T., 3/25/13, p. 52. Armstrong argues that the reference to 4.5 ounces of cocaine on the verdict slip made this amount an element of the offense which the Commonwealth had to prove beyond a reasonable doubt. Concise Statement, ¶ 1(f).

Armstrong is incorrect. The amount of cocaine is not an element of PWID, so it was not compulsory for the Commonwealth to prove the amount in order to convict Armstrong of PWID.[8] PWID requires proof that the defendant "both possessed the controlled substance and had an intent to deliver that substance." *Kirkland*, 831 A.2d at 611. The amount of the controlled substance is not "crucial to establish an inference of possession with intent to deliver, if ... other facts are present." *Watley, supra*, 2013 WL 6164340, at *4-5 (*citing Commonwealth v. Ratsamy*, 594 Pa. 176, 934 A.2d 1233, 1237 (2007). The totality of the circumstances can provide sufficient evidence to support a

---

[8] However, as discussed *infra* on pages 35-37, the Commonwealth *did* have to prove the amount of cocaine beyond a reasonable doubt in order to increase Armstrong's mandatory minimum sentence for PWID. This did not occur -- so while there is sufficient evidence for Armstrong's PWID conviction to stand, there is insufficient evidence to affirm his mandatory minimum sentence for PWID.

22

PWID conviction. *Id.* at *5. In this case, for the reasons given above, the evidence was more than adequate to establish Armstrong's guilt for this offense.

Inclusion of "4.5 ounces" on the verdict slip does not change this result, because the Court's jury instructions on the elements of PWID were proper. The verdict slip merely "exists to record the result of the jury's deliberation; it is not the deliberation itself, and the jury's deliberation is guided by the court's charge." *Commonwealth v. Ali*, 608 Pa. 71, 10 A.3d 282, 311 (2010); *see also id.*, 10 A.3d at 313 ("the verdict slip exists merely to record the jury's conclusion after it has deliberated. The verdict slip does not frame deliberations; the court's charge does"). The Court instructed the jury that PWID requires proof of four elements: (1) the item is a controlled substance; (2) Armstrong possessed the item; (3) he was aware of the item's presence and that it was a controlled substance; and (4) he had the specific intent to deliver it to at least one other person. N.T., 3/25/13, pp. 19-20, 42-44. These instructions accurately reflected the elements of PWID prescribed under Pennsylvania law. *Devine, supra.* Thus, the verdict of guilt was proper, notwithstanding the inclusion of "4.5 ounces" on the verdict slip.

**Fifth**, Armstrong insists that there was insufficient evidence to convict him of corrupt organizations due to the absence of evidence that he participated in an enterprise's affairs through a pattern of racketeering activity, or that he engaged in two predicate crimes. Concise Statement, ¶ 1(g). The discussion above demonstrates that the Commonwealth satisfied all elements of corrupt organizations. There was sufficient evidence of PWID and conspiracy to commit PWID (pp. 12-13, 19, *supra*), and there was circumstantial evidence of dealing in proceeds of unlawful activities and conspiracy to deal in such proceeds (pp. 13-14, *supra*, and p. 24, *infra*).

**Sixth**, Armstrong contends that there was insufficient evidence to convict him of dealing in proceeds of unlawful activities under 18 Pa.C.S. § 5111(a), because there was no evidence that he engaged in a financial transaction but only that he might have helped one of them count money. Concise Statement, ¶ 1(h). As discussed above, during a two week period in September and October of 2011, police officers recorded numerous conversations between Armstrong and Lester Womack discussing the amount to charge third persons for sales of cocaine. Many conversations took place after police observed Armstrong in Philadelphia carrying a bag of cocaine in Womack's presence. Armstrong and Womack also negotiated what Armstrong would charge for selling cocaine to Womack.

Critically, during one conversation on September 30th, Armstrong admitted selling half an ounce of cocaine for $500. Womack stored drugs and money from drug sales in his house in Darby, Pennsylvania, asked Armstrong to help him count money from drug sales, and referred to Armstrong as his "right-hand man."

In view of this evidence -- particularly Armstrong's admission to Womack that he sold half an ounce of cocaine and Womack's request that Armstrong help him count money from drug sales -- the evidence demonstrates that Armstrong participated in monetary transactions involving the proceeds of unlawful activity, a crime under 18 Pa.C.S. § 5111.

**Seventh**, Armstrong complains that there was insufficient evidence to convict him of unlawful use of a communication facility under 18 Pa.C.S. § 7512 because the Commonwealth did not prove that any specific underlying offense occurred through use of a communication facility. Concise Statement, ¶ 1(i). This argument fails, because the

24

evidence demonstrates that Armstrong committed PWID through the use of a communication facility.

*Commonwealth v. Moss*, 852 A.2d 374 (Pa. Super. 2004), is instructive. *Moss* held that because § 7512 does not have a specific scienter requirement, the *mens rea* for this provision is found in 18 Pa.C.S. § 302(c), which provides: "When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly, or recklessly with respect thereto." Thus, to sustain a conviction under § 7512, the Commonwealth must prove that the defendant (1) knowingly and intentionally used a communication facility; (2) knowingly, intentionally or recklessly facilitated an underlying felony; and (3) the underlying felony occurred. *Moss*, 852 A.2d at 382.

In this case, Armstrong had multiple phone conversations with Lester Womack to knowingly or intentionally facilitate sales of drugs. Many conversations took place after police observed Armstrong in Philadelphia carrying a bag of cocaine in Womack's presence. Armstrong and Womack bargained with one another on the telephone about the price to charge for drug sales. The conversations also established that both Armstrong and Womack sold cocaine during this two week period, and that money from these sales was stored at Womack's mother's residence in Darby. Armstrong's use of the telephone thus played an integral role in his commission of PWID.

**Eighth,** Armstrong states that there was insufficient evidence to convict him of conspiracy because the Commonwealth did not prove that he conspired with anyone else to commit any crime. Concise Statement, ¶ 1(j). The discussion above demonstrates that

25

Armstrong conspired with Lester Womack to sell cocaine over the two week period in September and October 2011.

**Ninth,** Armstrong states that there was insufficient evidence to establish that he engaged in a criminal enterprise with anyone but himself or acted for the benefit of anyone but himself, Concise Statement, ¶ 1(k), or that he profited from any criminal enterprise with anyone but himself. Concise Statement, ¶ 1(l). The discussion above demonstrates that Armstrong engaged in an enterprise with Lester Womack to sell cocaine over the two week period in September and October 2011, and that he and Womack both profited from this enterprise.

**Tenth,** Armstrong makes the following boilerplate objections: there was insufficient evidence that he possessed a controlled substance (Concise Statement, ¶ 1(m)); there was insufficient evidence to convict him of any crime (Concise Statement, ¶ 1(n)); the jury ignored exculpatory evidence which was inconsistent with guilt (Concise Statement, ¶ 1(q)); there was a lack of sufficient specificity as to time, date, place and actions to support any conviction (Concise Statement, ¶ 1(r)); and the evidence was insufficient to sustain the verdict (Concise Statement, ¶ 1(u)). The discussion above rebuts these objections.

**Eleventh,** Armstrong claims that he was not properly identified as a speaker in any of the taped phone conversations due to the Commonwealth's failure to present an expert witness in voice identification (Concise Statement, ¶ 1(o)). He further insists that the audiotapes did not establish his involvement in any crime (Concise Statement, ¶ 1(p)).

26

Pennsylvania Rule of Evidence 901 provides in pertinent part:

Requirement of authentication or identification

(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be.

        * * *

(5) Voice identification. Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

(6) Telephone conversations. Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (A) in the case of a person, circumstances, including self-identification, show the person answering to be the one called, or (B) in the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone.

Under Rule 901(b)(5) and (6), a witness may make an identification by voice alone, and expert testimony is not necessary for voice identification. *Commonwealth v. Jones*, 954 A.2d 1194, 1197 (Pa. Super. 2008). Identification by voice goes to the weight of the evidence, not its sufficiency. *Id.*

The Superior Court has held several times that audio recordings were admissible on the basis of a police officer's testimony that he spoke with the defendant and recognized the defendant's voice on the audio recording. *Commonwealth v. Serrano*, 61 A.3d 279, 291 (Pa. Super. 2013) (sufficient foundation supported admission of recorded telephone conversations between defendant and co-defendant in drug prosecution; agent

27

of the Pennsylvania Office of the Attorney General testified that the telephone number was registered to defendant and that he had personally spoken with defendant and recognized the voice on the audio recording as belonging to defendant); *Commonwealth v. Starks,* 304 Pa. Super. 527, 450 A.2d 1363, 1364–1365 (1982) (finding adequate foundation for admission of tape recordings where the interviewing detective identified the tape in its original physical form, and identified the voices and the opening contents of the recording).

Notably, Pa.R.E. 901(a) and (b) are identical with Federal Rule of Evidence 901(a) and (b). The cases under F.R.E. 901 permit voice identification on the basis of lay testimony from law enforcement personnel. *See United States v. Lampton,* 158 F.3d 251, 259 (5th Cir. 1998) (FBI Agent could identify voice on tape through hearing voice "in prior personal contact"); *United States v. Saulter,* 60 F.3d 270, 276 (7th Cir. 1995) (voice identification may be made based on "minimal familiarity"; hearing voice on two prior occasions sufficient to allow witness to identify speaker on tape); *United States v. Vitale,* 549 F.2d 71, 73 (8th Cir. 1977) (undercover police officer properly allowed to identify voice on incoming telephone call on basis of three other conversations with person, where two of these occurred in "face-to-face meetings"); *United States v. Watson,* 594 F.2d 1330, 1335 (10th Cir. 1979) (witness had three "face-to-face conversations" with defendant, one extending "over half an hour"; these sufficed as basis for voice identification).

Under these authorities, the Court properly admitted the audio recordings of Armstrong's conversations with Womack into evidence. Agent Kelly testified that he recognized Armstrong's voice on these recordings because he spoke with Armstrong

after his arrest. N.T., 3/20/13, pp. 91-92, 97-98. Although expert testimony and scientific evidence might have been helpful, it was not essential to admission of the audio recordings.

## IV. ARMSTRONG'S CHALLENGE TO THE WEIGHT OF THE EVIDENCE

Armstrong argues that the verdict was against the weight of the evidence because the jury lumped him together with other drug traffickers such as Womack, and because the Commonwealth "speculated" on his involvement. Concise Statement, ¶ 1(S, T).

> An allegation that the verdict is against the weight of the evidence
>
> is addressed to the discretion of the trial court. Our Supreme Court has explained that appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. ***Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner.*** A new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. Stated another way, and as the trial court noted, this Court has explained that the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

*Commonwealth v. Sullivan,* 820 A.2d 795, 805–806 (Pa. Super. 2003), *appeal denied,* 574 Pa. 773, 833 A.2d 143 (2003) (citations and quotations omitted, emphasis in original). The question the trial court must answer, in the sound exercise of its discretion, is whether "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Id.,* 820 A.2d at 806 (*citing Commonwealth v. Widmer,* 560 Pa. 308, 320, 744 A.2d 745, 752 (2000)). Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the

verdict is against the weight of the evidence. *Widmer, supra*, 744 A.2d at 753. "A trial court's exercise of discretion in finding that a verdict is or is not against the weight of the evidence is 'one of the least assailable reasons for granting or denying a new trial.' " *Sullivan, supra*, 820 A.2d at 806 (*citing Widmer, supra*, 744 A.2d at 753). The Court abuses its discretion when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. *Widmer*, 744 A.2d at 753. Discretion is abused where it is not exercised on a foundation of reason. *Id.*

The Court finds that the verdict was consistent with the weight of the evidence. The evidence summarized above – particularly the telephone conversations and the officers' surveillance testimony – demonstrates that Armstrong played an integral role in a drug dealing conspiracy that spanned Philadelphia, Delaware and Chester Counties. The Court would have reached the same verdict as the jury had there been a bench trial.

## V. ARMSTRONG'S CHALLENGE TO THE AFFIDAVIT OF PROBABLE CAUSE APPENDED TO HIS CRIMINAL COMPLAINT

Armstrong contends that his arrest "was based on faulty information provided to the Court by the Commonwealth. . .thus his arrest was illegal, jurisdiction over him was improper and his entire prosecution illegal." Concise Statement, ¶ 4. Armstrong has waived this argument by failing to raise it with sufficient specificity in his concise statement. *Lemon, supra*, 804 A.2d at 37. The affidavit appended to the criminal complaint is 25 pages long, most of it single-spaced. Due to the absence of detail in the concise statement, the Court cannot pinpoint the "information" in the lengthy affidavit that Armstrong believes is "faulty".

30

Moreover, in order to invalidate an arrest warrant, a misstatement of fact in the affidavit must be both material and deliberate. *Commonwealth v. Bradshaw,* 290 Pa. Super. 162, 434 A.2d 181 (1981). A misstatement in an affidavit is immaterial if deletion of the misstatement would still leave sufficient facts to establish probable cause. *Commonwealth v. Wiggins,* 239 Pa. Super. 256, 361 A.2d 750, 753 (1976). Here, Armstrong fails to allege that (or explain why) the alleged misstatements in the affidavit are material. Therefore, it is impossible for the Court to delve into this issue further.

## VI. ARMSTRONG'S CHALLENGE TO TRANSCRIPTS OF INTERCEPTED TELEPHONE CONVERSATIONS

Armstrong complains that the jury viewed transcripts of his conversations with Womack, even though the transcripts were not authenticated by the person who prepared them or anyone else, and then viewed the transcripts again after the close of testimony. Concise Statement, ¶ 5. Based on *Commonwealth v. Bango,* 560 Pa. 84, 742 A.2d 1070 (1999), the Court rejects Armstrong's argument.

In *Bango,* a PWID case, the prosecution played 53 tape-recorded conversations to the jury during the defendant's trial. The state trooper who had prepared transcripts for each conversation testified as to whose voices were on the tapes and the substance of the conversations. The trial court cautioned the jury that the tapes, and not the transcripts, were the actual evidence, and that the only purpose for the transcripts was to aid the jury in following the taped conversations. During deliberations, the jury asked the court for permission to review the tape recordings and the transcripts. The court allowed the transcripts to go out with the jury but warned them again that the tapes were the evidence instead of the transcripts, and that the transcripts were only "to help you identify what

31

tape it is you are looking for and listening to and guide you somewhat as to what you are hearing."

The Supreme Court held that trial court's decisions concerning the transcripts were proper. The Supreme Court first observed that "there are some items that the jury is never permitted to take with it during its deliberations, [such as] transcripts of any trial testimony, copies of any written or otherwise recorded confessions by the defendant, copies of the information, and written jury instructions." *Id.*, 742 A.2d at 88-89 (*citing* Pa.R.Crim.P. 1114(2))[9]. The transcripts of the tape recordings "do not fall into any of the categories of items specifically prohibited either by Pa.R.Crim.P. 1114(2) or by case law." *Id.* at 89. The Supreme Court then determined that the trial court acted within its discretion in permitting use of the transcripts:

> Here, in light of the meticulous care taken by the trial court to ensure that the jury understood that the transcripts were to be used only as guideposts and not as verbatim translations, we cannot characterize the trial court's decision to permit the jury to use the transcripts as manifestly unreasonable. . .It is axiomatic that a trial is a search for the truth. The jury should be assisted, not hindered, in conducting that search. Here, it is plain that the jury was seeking a complete understanding of how the voluminous evidence related to the specific crimes with which appellant was charged. After two hours of deliberation, the jury asked for the name of each person involved with appellant in each count as well as the tapes and transcripts pertaining to those counts. The trial court properly realized that the transcripts could serve as an index to the tapes, assisting the jurors in finding those tapes that they wished to replay and allowing them to more easily correlate which of the seventeen recorded voices they were listening to with the corresponding counts charged against appellant. Not only did the trial court appropriately instruct the jurors that they could review the transcripts for these narrowly circumscribed purposes, but the court also clearly instructed the jury that they, as jurors, were independently responsible for ascertaining the *content* of the tapes. Under these somewhat daunting factual circumstances, with the jury attempting to match a large number of unfamiliar tape-recorded voices to an even larger number of counts describing disparate incidents of narcotics trafficking, the trial court prudently addressed the situation by permitting the jury to use the transcripts as limited guideposts to the recordings. Far from exhibiting manifest unreasonableness, the trial court's decision was grounded in common sense and

---

[9] In 2000, Rule 1114 was renumbered as Pa.R.Crim.P. 646.

allowed the jury to evaluate and weigh the evidence in an efficient and reliable manner.

*Id.* at 89-90.

This case is on point with *Bango*. Like the trooper in *Bango*, Agent Kelly listened to the telephone calls between Armstrong and Womack and authenticated the transcripts of the recordings. N.T., 3/20/13, pp. 54-55. Then, like the trial court in *Bango*, this Court instructed the jury that the transcripts were simply an "aid to you in determining the content of the telephone conversations. It's very important that you remember, however, that the evidence in this case is the telephone conversation that was recorded and not the transcription. The transcription is provided simply as an aid for you in listening and discerning the content of the conversations." N.T., 3/20/13, p. 56. The Court added that "the same instructions pertain to each transcription that will be provided to you." N.T., 3/20/13, p. 56. Later, during deliberations, the jury asked to see a transcript concerning when Armstrong said he had four ounces that he cooked and lost 28 grams but made $500. N.T., 3/25/13, p. 45. The Court permitted the jury to see the transcripts of several conversations relating to this issue but stated:

> However, I need to caution you to remember, and this is a very important point, that these transcripts are not evidence in the case. They are aids to enhance your understanding of the telephone calls, the audio calls which are the evidence in the case. And you must be very careful to regard them for that limited purpose only. Therefore, while you can certainly have the transcripts of the sessions that counsel and I believe reflect your inquiry, the evidence itself is the audiotape.

N.T., 3/25/13, pp. 45-46.

Permitting the jury to view the transcripts during the presentation of evidence and deliberations was well within the Court's discretion. As in *Bango*, there were dozens of phone conversations between Armstrong, Womack and others, so the jury needed the

transcripts as guideposts to follow who was talking, when they were talking, and what they were talking about. Moreover, the Court repeatedly cautioned the jury that they could only use the transcripts as guideposts, and that the audio recordings were the actual evidence, and that it was the jury's duty to decide the actual content of the conversations. This procedure made sense under the circumstances by permitting the jury to evaluate the evidence in an efficient and reliable manner.

## VII. ARMSTRONG'S CHALLENGE TO THE JURY INSTRUCTIONS

Armstrong contends that the Court instructed the jury "that cocaine was a controlled substance, and that that element of the crime had been established, when in fact the substance possessed by [Armstrong], if any, was in dispute and was a fact that had to be determined by the factfinder beyond a reasonable doubt. In effect, the jury was instructed that [Armstrong] possessed cocaine." Concise Statement, ¶ 6.

Armstrong waived this issue by failing to object to the jury instructions relating to possession of cocaine or PWID. N.T., 3/25/13, pp. 35, 40-41 (Court asks whether defense counsel has any objections, but Armstrong's counsel does not object to instructions on possession or PWID). Armstrong waived this objection by failing to lodge an objection before jury deliberations. Pa.R.Crim.P. 647(B); *Commonwealth v. Dorm*, 947 A.2d 1284, 1288 (Pa. Super. 2009).

In any event, Armstrong is incorrect. Although the Court told the jury that cocaine is a controlled substance, N.T., 3/25/13, pp. 19-20, the Court instructed that they jury had to find three additional elements before finding Armstrong guilty of PWID: (a) Armstrong possessed the substance; (b) he was aware of the item's presence and that it was a controlled substance; and (c) he had the specific intent to deliver it to at least one

34

other person. N.T., 3/25/13, p. 20. Thus, the Court left it to the jury to determine whether Armstrong actually possessed cocaine. The Court did *not* in effect instruct the jury that Armstrong possessed cocaine.

## VIII. ARMSTRONG'S CHALLENGE TO VALIDITY OF HIS SENTENCE

Armstrong argues that the Court improperly sentenced him on Count 9 (PWID) to a mandatory minimum of six years imprisonment[10], because there was insufficient evidence that (a) he possessed over 100 grams of cocaine; (b) the weight of uncut cocaine was over 100 grams; and (c) he possessed all 100+ grams of uncut cocaine with intent to deliver them. Concise Statement, ¶ 7. The Court concludes that Armstrong's PWID sentence is invalid under *Alleyne v. United States,* -- U.S. --, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013), a Sixth Amendment decision entered one month after Armstrong's sentence.

*Alleyne* held that where an "aggravating fact" increases a mandatory minimum sentence, "the fact *is an element* of a distinct and aggravated crime. [The fact] must, therefore, be submitted to the jury and found *beyond a reasonable doubt.*" *Id.*, 133 S.Ct. at 2162-63 (emphasis added). In this case, the Commonwealth charged Armstrong with possession of 4.5 ounces of cocaine with intent to deliver; the verdict slip stated the amount of 4.5 ounces; the jury found him guilty of PWID; and the Court imposed a minimum sentence of seven years based on its belief that the evidence was sufficient to require this enhancement[11]. Unfortunately, the Court did not instruct the jury that the amount of 4.5 ounces is an element of PWID, or that the jury had to find this amount

---

[10] The Court actually sentenced Armstrong to 7-14 years imprisonment. N.T., 5/6/13, p. 25.

[11] There is no mandatory minimum for PWID when the amount of cocaine is less than two grams. 18 Pa.C.S. § 7508(a)(3). When the Commonwealth proves that amount involved is at least 100 grams, and when the defendant has at least one conviction for another drug trafficking offense at the time of sentencing (as Armstrong had here), the mandatory minimum is seven years imprisonment. 18 Pa.C.S. § 7508(a)(3)(iii).

35

beyond a reasonable doubt. Consequently, the Court lacked the authority to increase Armstrong's sentence to a mandatory minimum of 7 years. *Id.*

This Court has the authority to raise *Alleyne sua sponte* even though Armstrong failed to mention *Alleyne* in his concise statement. Questions about the legality of Armstrong's sentence are not waivable and may be raised *sua sponte* by courts on direct appeal. *Watley, supra,* 2013 WL 6164340, at *7. Moreover, a decision announcing a new constitutional rule of criminal procedure must be applied retroactively to all cases pending on direct appeal. *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); *Commonwealth v. Roney,* 581 Pa. 587, 866 A.2d 351, 359 n. 32 (2005) (challenge to sentence premised upon *Apprendi v. New Jersey,* 530 U.S. 466 (2000), implicates the legality of that sentence and cannot be waived on direct appeal).

The proper remedy under these circumstances is to vacate the sentences for *all* of Armstrong's convictions and to remand so that this Court has the opportunity to restructure its entire sentencing scheme. *Commonwealth v. Goldhammer,* 512 Pa. 587, 593, 517 A.2d 1280, 1283-84 (1986); *Commonwealth v. Williams,* 871 A.2d 254, 266 (Pa.Super.2005) (citing, *inter alia, Goldhammer, supra,* in remanding for re-sentencing because trial court's overall sentencing scheme had been disrupted by appellate court's determination that imposition of separate sentences under two different provisions of Motor Vehicle Code was improper in this driving under the influence case); *Commonwealth v. Sutton,* 400 Pa.Super. 291, 583 A.2d 500, 502 (1990) (citing *Goldhammer, supra,* for proposition that "the proscriptions against double jeopardy do not prevent us from remanding for re[-]sentencing on all bills of information where our vacation of various related counts has upset the trial court's sentencing scheme");

*Commonwealth v. Vanderlin,* 398 Pa.Super. 21, 580 A.2d 820, 831 (1990) (reiterating that where appellate court cannot determine whether its vacation of sentence on one count would affect trial court's sentencing on remaining counts, trial court must be given opportunity on remand to reconsider sentencing). *Alleyne* precludes sentencing Armstrong to mandatory minimum sentences for any count, because the jury did not find any aggravating factors beyond a reasonable doubt. On the other hand, the Court has the discretion to impose sentences of appropriate length for all counts of conviction under non-mandatory minimum principles in order to structure the proper penalty for Armstrong's crimes.

For these reasons, the Court's decisions on all non-*Alleyne* issues should be affirmed, but this case should be remanded for resentencing on all counts of conviction.

**BY THE COURT:**

_____
**JENKINS,** **J.**